FRANK ROLLER v. DAVID G. ALLEN, GEORGE W. CARTER, O. A. RITCH, FRANK R. SMITH, ERVIN R. BEAN AND F. E. WALLACE, JR.

(Filed 27 February, 1957.)

**1. Injunctions § 4g: Constitutional Law § 6½—**

While ordinarily the constitutionality of a statute cannot be tested by suit to enjoin its enforcement, injunction will lie when equitable relief is necessary to protect fundamental property or human rights guaranteed by the organic law.

**2. Same—**

A person seeking to engage in a particular occupation may challenge by injunction the constitutionality of the statute requiring a license to engage in such occupation when he alleges and offers evidence tending to show that his fundamental right to earn a livelihood was circumscribed by the Act.

**3. Appeal and Error § 50—**

In injunction proceedings the Supreme Court is not bound by the findings of the lower court but may examine the evidence and reach its own conclusions as to the facts.

**4. Constitutional Law § 11—**

A statute must have some substantial relation to the public health, morals, order, safety or general welfare in order to be valid as an exercise of the police power.

**5. Constitutional Law § 17—**

G.S. Chapter 87, Article 3, requiring a license for any person, firm or corporation undertaking to lay, set or install ceramic tile, marble or terrazzo floors or walls, *is held* unconstitutional as an unwarranted interference with the fundamental right to engage in an ordinary and innocuous

occupation in contravention of Article I, Sections 1, 7, 17 and 31 of the Constitution of North Carolina. The statute cannot be upheld as an exercise of the police power, since its provisions have no substantial relation to the public health, safety or welfare but tend to create a monopoly.

**6. Constitutional Law § 10b—**

While the Court must assume that the Legislature acted within its powers until the contrary clearly appears, and in cases of doubt will resolve the question of constitutionality in favor of validity, where a statute unreasonably obstructs the common right of the persons affected to engage in an ordinary and harmless occupation in violation of the organic law, it is the duty of the Court to declare the Act unconstitutional.

RODMAN, J., took no part in the consideration or decision of this case.

APPEAL by the plaintiff from *Phillips, J.,* RICHMOND Superior Court, 19 May, 1956, in Chambers.

Civil action against the individual members comprising the North Carolina Licensing Board for Tile Contractors and the Executive Secretary of the Board to restrain them from enforcing Chapter 87, Article 3, General Statutes of North Carolina, on the ground that the article is in violation of plaintiff's constitutional rights under Article I, Sections 7 and 31, Constitution of North Carolina, and under the 14th Amendment to the Constitution of the United States. The Superior Court, after hearing, held the Act a valid exercise of legislative authority, denied the application for injunction, and dismissed the action. From the judgment accordingly, the plaintiff appealed.

*Page & Page,*
*By: John T. Page, Jr., for plaintiff, appellant.*
*Fletcher & Lake,*
*By: I. Beverly Lake, for defendants, appellees.*

HIGGINS, J. The parties concede that if Chapter 87, Article 3, General Statutes is a valid exercise of legislative power, the judgment below should be affirmed. On the other hand, they concede that if the Act is in violation of plaintiff's constitutional rights, the judgment should be reversed. Counsel have confined the discussion solely to the constitutional question involved.

Plaintiff does not contend the North Carolina Licensing Board for Tile Contractors acted arbitrarily in refusing to issue him a license to engage in tile, marble, and terrazzo contracting. He does contend, however, that the Constitution of North Carolina denies to the General Assembly the power to enact legislation requiring the license.

In summary, Chapter 87, Article 3, provides: The North Carolina Licensing Board for Tile Contractors shall be composed of five mem-

bers, each of whom shall have had at least five years experience in tile contracting. The Act requires a license from "any person, firm, or corporation who, for profit, undertakes to lay, set, or install ceramic tile, marble, or terrazzo floors or walls in buildings for private or public use." The Board is authorized to make rules to govern its proceedings and for the examination of applicants for license. The applicant must have had at least two years experience or its equivalent as a tile, marble, or terrazzo student or mechanic, possessing the knowledge to specify the proper kind of such materials and the ability to install the same in accordance with specifications and blueprints. All persons actively engaged in tile contracting on the effective date of the Act are entitled to license without examination. The Board is given power to suspend or revoke license (among other causes) for incompetency or inefficiency in carrying on the business of tile contracting. Any person not licensed who engages in tile contracting and any architect, engineer, or contractor who receives or considers a bid from an unlicensed contractor, shall be guilty of a misdemeanor and fined not less than $200, or imprisoned not less than two months, or both fined and imprisoned, in the discretion of the court. Each applicant must pay $25.00 to take the examination and $50.00 for each yearly renewal of license. Exempt from the provisions are all contracts in which the total cost of materials and labor does not exceed $150; all contracts in State colleges, hospitals, and other State buildings.

The plaintiff attempted, but failed, to pass the examination given by the licensing board. The evidence of both parties, however, discloses that he has engaged to some extent in tile contracting without a license. The evidence indicates the licensing board has made no attempt to have him prosecuted under the penal provisions of the Act. If indicted, he could plead as a defense the unconstitutionality of the licensing Act. Inasmuch as he has not been indicted, that method of raising the question is not open to him. Undoubtedly, it is the well established general rule that the constitutionality of an Act cannot be challenged in a suit to enjoin its enforcement. *Jarrell v. Snow,* 225 N.C. 430, 35 S.E. 2d 273; *Scott v. Smith,* 121 N.C. 94, 28 S.E. 64. However, the exception to the rule is as well established as the rule itself. *Clinard v. Winston-Salem,* 217 N.C. 119, 6 S.E. 2d 867. An Act will be declared unconstitutional and its enforcement will be enjoined when it clearly appears either that property or fundamental human rights are denied in violation of constitutional guarantees. *Biscuit Co. v. Sanford,* 200 N.C. 467, 157 S.E. 432; *Advertising Co. v. Asheville,* 189 N.C. 737, 128 S.E. 149. The right to work and to earn a livelihood is a property right that cannot be taken away except under the police power of the State in the paramount public interest for reasons of health, safety, morals, or public welfare. *Advertising Co. v. Asheville, supra.* "The right to

conduct a lawful business or to earn a livelihood is regarded as fundamental." *McCormick v. Proctor,* 217 N.C. 23, 6 S.E. 2d 870; *S. v. Harris,* 216 N.C. 746, 6 S.E. 2d 854; 19 Am. Jur. 144.

An additional ground upon which the plaintiff claims the right to challenge the validity of the licensing Act by injunction is the fact, as he alleges, that architects, engineers, and contractors refuse to receive or consider his bids because they fear prosecution. In answer to plaintiff's allegation to that effect, the defendants admit their purpose to enforce the Act.

The evidence discloses that at least one contractor had plenty of work for plaintiff but refuses to consider his bids solely because he is not licensed. We hold, therefore, that this case falls within the exception to the general rule. The constitutionality of the Act is challenged in this proceeding.

The evidence of both parties consisted of *ex parte* affidavits. The plaintiff presented affidavits from engineers, architects, and building contractors who stated in substance that they are familiar with the uses and installation of tile, marble, and terrazzo as building materials and that the installation is simple, easy to learn, and requires no special skill; that manufacturers of these materials describe their purposes and uses in catalogues and other advertising so that the selection of the proper materials for different uses is simple and easy. Some of the affiants stated that the plaintiff had worked for them and that his work was especially well done and entirely satisfactory.

The defendants offered affidavits of two members and the executive secretary of the licensing board and others, among them engineers, architects, and contractors, to the effect that the selection and installation of proper tile, marble, and terrazzo for the various uses is a highly technical and complicated business and requires special and unusual skill. The executive secretary of the licensing board, however, stated: "The United States Department of Commerce has published various pamphlets concerning minimum specifications and requirements for the setting and installing of ceramic tiles. The Tile Council of America, which is an association formed by the manufacturers of ceramic tile, have constantly engineered and developed books of instruction to assure proper installation of these products."

One of the defendants' affidavits from a contractor disclosed that the plaintiff had been discharged because his work was unsatisfactory.

While there is disagreement as to how simple or how complicated the business of tile contracting is, there is, however, general agreement that the installation of tile and marble consists of the following steps: A metal mesh lath is nailed to the wall and covered with a plastic mixture of cement, lime, and sand about one-fourth-inch thick. This mixture is permitted to harden. Another like mixture is applied and while it is in

the plastic state the tile or marble blocks are pressed into place, beginning at the bottom of the space to be covered, and the seams are then beveled. Tile and marble are wall materials that are non load-bearing. That is, they do not support any other part of the structure. Terrazzo (basically a floor material) is a built-up type of flooring consisting of mixed cement, sand, and lime into which marble chips are pressed when the mixture is plastic. After it hardens, a buffing and polishing machine is run over it until the surface is smooth and even. The installation of terrazzo is usually upon a subfloor of concrete or some other solid base prepared by the general building contractor.

Ceramics as building and surfacing materials have been manufactured and used for more than 4,000 years. The following is quoted from a United States Government publication, entitled "Earthen Floor & Wall Tiles:"

> "Floor and wall tiles, together with other products of fired clay, were produced in a very early period of the industrial history of mankind, a fact probably accounted for by the widespread occurrence of the raw materials and the comparative simplicity of manufacturing methods. Fired clay objects are usually among the articles discovered by archaeologists in the ruins of ancient civilizations, and there is ample evidence that the early builders in the Nile Valley and the Tigris-Euphrates Basin, as well as in other areas, were familiar with the superior qualities of fired clay as a medium of surface covering and used it extensively in their work. The famous doorway of blue glazed tile found in the Step Pyramid and now in a Berlin museum, the tile facing of the Istar Gate and the decorations of the Processional Street of Babylon, the famed Archers and Lions friezes from the palace of Darius at Susa— these and many other examples attest the antiquity of ceramic art and the technical competence of the ancient ceramists.

> "The art of tile production in Europe was advanced greatly by the Persians, and it is to Saracenic Persia that the world largely owes the preservation and development of the art during the Medieval and Renaissance periods. It is said that the course of Saracen conquests can almost be traced by the glazed and decorated wall tiling of their buildings, for many of the tiles produced during those periods still adorn the ancient mosques and shrines of Bagdad and Damascus."

From the evidence offered, the trial court found as a fact that the examining board was justified in finding from the written examination the plaintiff did not possess the qualifications required by the licensing

Act and did not pass the examination. The crucial finding is here quoted:

"6. That tile contracting is not an ordinary trade, but is a highly skilled trade and due to the many varieties of tile, marble, and terrazzo materials and of the uses thereof, the restriction of the right to engage in the business of tile contracting to those persons possessing the qualifications prescribed by G.S. 87-33 is necessary and reasonable in order to protect the public from fraud, imposition and incompetency, to promote the public health, sanitation, safety and general welfare."

The court concluded as a matter of law, (1) the licensing Act does not create a monopoly; (2) it is reasonable and necessary to prevent fraud and incompetence, and to promote public health; (3) does not violate either the Constitution of North Carolina or of the United States. The plaintiff's exceptions and assignments of error call in question the correctness of the court's findings of fact and conclusions of law. Ordinarily, this Court is bound by the findings of the Superior Court if there is competent evidence to support them. This rule, however, does not apply in injunction proceedings. In such cases it is the duty of this Court to examine the evidence and draw its own conclusions. *Lance v. Cogdill,* 238 N.C. 500, 78 S.E. 2d 319; *Cahoon v. Comrs.,* 207 N.C. 48, 175 S.E. 846; *Angelo v. Winston-Salem,* 193 N.C. 207, 136 S.E. 489. ". . . in a suit of this character (injunction) the appellate court may examine the evidence and reach its own conclusions as to the facts." *Advertising Co. v. Asheville, supra; Sanders v. Ins. Co.,* 183 N.C. 66, 110 S.E. 597.

Is Chapter 87, Article 3, General Statutes, a valid exercise of the police power of the State in the public interest for reasons of health, safety, morals, or welfare? This Court must assume the Legislature acted within its powers until the contrary clearly appears. *Glenn v. Board of Education,* 210 N.C. 525, 187 S.E. 781. The defendant contends the licensing Act is a valid exercise of the police power reasonably necessary (1) to promote public health, and (2) to protect the public from imposition and fraud by reason of the inherent difficulty in detecting faulty workmanship in tile selection and installation. The defendant offered the affidavit of the Director of Sanitary Engineering, Division of the North Carolina Board of Health: "Approximately 200 sanitarians work with the local health departments in this State and they generally recommend ceramic tile where sanitation problems exist. That this department does not specify general installation procedures but recognizes the sanitation problems that arise as a result of inferior workmanship or improper materials. That the Division recommends

that all work done when tile is specified be done in a manner that will satisfy sanitation requirements. That new developments in these areas of construction both in products and techniques when used by competent personnel insure installations more satisfactory to all concerned." The purport of the above is that the more skilled and experienced the workman, the more satisfactory will be his work. The same can be said of any other trade in which human beings engage—even to shining shoes. Usually, the greater the skill, the higher the charge. If only those of the highest skill are permitted to do the work, those who are unable to pay the higher prices for tile must use wood, brick, concrete, linoleum, or some other material which the ordinary workman is permitted to install. An average man with an average purse has a right to employ a workman of ordinary skill to perform an ordinary task.

The health claim is considerably weakened by the failure of the Act to assign to the health authorities any additional duties or give them any voice in the work of the licensing board. The very exceptions in the Act, that it shall not apply to contracts of less than $150.00 and for work done on State colleges, hospitals, or other State buildings, regardless of cost, suggest that health is certainly not a primary consideration. Of course, health to some extent enters into all construction where people live and work. It is not enough that health may be indirectly affected. "If a statute is to be sustained as a legitimate exercise of the police power, it must have a rational regard or substantial relation to the public health, morals, order, or safety, or general welfare. In brief, it must be reasonably necessary to promote the accomplishment of a public good or to prevent the infliction of a public harm." *S. v. Ballance*, 229 N.C. 764, 51 S.E. 2d 731; *Skinner v. Thomas*, 171 N.C. 98, 87 S.E. 976; *Glenn v. Express Co.*, 170 N.C. 286, 87 S.E. 136. This challenge to the licensing Act is not answered by saying the plaintiff did not pass the written examination prepared by the board. Tile work consists of selecting and installing tile. The affidavit of the Executive Secretary of the Licensing Board says: "The United States Department of Commerce has published various pamphlets concerning minimum specifications for setting ceramic tiles. The Tile Council of America . . . have constantly engineered and developed books of instruction *to assure proper installations of their products.*" (Emphasis added.) The evidence further discloses that tile catalogues and advertising recommend the type of tile for different uses. Nothing in the record shows that a man of average intelligence and some aptitude for such work cannot learn quickly enough to do average work. Successful tile contracting consists in doing the work rather than describing it in a written examination paper. In all probability the average worker could learn to do acceptable tile work as quickly as he can learn to describe it on paper. The plaintiff's written examination is a part of the record. Undoubt-

edly those who are inclined to be fastidious in the use of the words that go to make up our mother tongue would not be impressed with the plaintiff's selection of words or the way he spells them. According to tradition, the most skillful blacksmith in the writer's native county lost his life by reason of a handicap similar to plaintiff's. In explaining the cause of death, George's more literate brother said, "Yes, lack of education killed him. The trouble was, he couldn't spell. He thought the proper way to spell the eighth month is O-r-g-u-s-t and he ate some oysters that killed him."

The defendant further urges that the licensing Act can be sustained upon the ground that tile installing is a trade in which it is easy to practice fraud upon the public by doing shoddy work and that by policing the industry the public welfare will be promoted. In the case of *S. v. Ballance, supra, Justice Ervin* answers a similar argument: "The initial defect in this argument is that it runs counter to the economic philosophy generally accepted in this country that ordinarily the public is best served by the free competition of free men in a free market. To be sure, a dishonest photographer may defraud those with whom he deals. So may a dishonest person in any other calling. Indeed, fraud has been practiced on occasion in all relations of life since the serpent invaded Eden and misrepresented the qualities of the forbidden fruit to the woman. . . . 'In our opinion, the right to earn one's daily bread cannot be made to hang on so narrow a thread. *Rawles v. Jenkins*, 212 Ky. 287, 279 S.W. 350.'"

Significantly, all members of the licensing board must come from the industry. Neither the health, police, nor welfare authorities are given any voice or control. Not only does the licensing board have the exclusive right to say who shall be licensed, but upon complaint supported by affidavit, it may suspend or revoke a license for incompetence or inefficiency in doing tile work. It is doubtful whether any other licensing agency has been granted the facilities for such tight and absolute control over any profession or business. The licensing board has the power to make a monopoly out of an industry which one of the defendants' witnesses described as having grown "into a major segment of today's construction business."

Notwithstanding the growth of the business, there are only 107 persons, firms, and corporations licensed "to lay, set, or install ceramic tile, marble, or terrazzo floors or walls in buildings for profit." How many were in the business in 1937 and licensed without examination is not disclosed by the record. In order to qualify for the examination, the applicant must have had two years experience as a student or mechanic, or its equivalent, next preceding the application for license. From the foregoing it is difficult to conclude otherwise than that the effect of the

licensing Act is to give control of tile contracting to those already in the business and a continuing opportunity to perpetuate that control.

Historically significant is the fact that regimentation and control over trades and industry by law reached its high water-mark about 1937. In 1940 this Court gave expression to its concern over the tendency in the following words of warning:

"The state of internal protest has been reached. In marginal cases controversies in the courts have arisen as to whether the organization has captured a sufficient *quantum* of public purpose to operate as an agency of the government, or whether the police power of the State, ostensibly exercised for a public purpose, is not really farmed out to a private group to be used in narrowing the field of competition, or in aid of exploitation by creating remunerative positions in administration. *Roach v. Durham,* 204 N.C. 587, 169 S.E. 149; *S. v. Lawrence,* 213 N.C. 674, 197 S.E. 586. Without the aid of the statute these groups would be mere trade guilds, or voluntary business associations; with it they become State agencies, retaining, however, as far as possible, distinctive guild features. An exclusive self-governing status is achieved by the device of securing a majority membership on the administrative boards or commissions, and in aid of this the power of the State is heavily invoked by way of prosecution in the criminal courts of those who are unable to secure the approval of the board and obtain license to engage in the occupation."

The foregoing is quoted from *S. v. Harris,* 216 N.C. 746, 6 S.E. 2d 854.

One year after the passage of Chapter 87, Article 3, General Statutes, Professor Hanft and Mr. Hamrick of the University Law School, published an article entitled, "Haphazard Regimentation Under Licensing Statutes," Vol. 17, N. C. Law Review, 1. As bad examples of licensing acts (among others) the article lists licensing of photographers (held unconstitutional, *S. v. Ballance, supra*), drycleaners (held unconstitutional, *S. v. Harris, supra*), and tile contractors:

"This review of some of the decisions on the question of the validity of statutes or ordinances providing for regulation of occupations by licensing makes it apparent that where the occupation has no special relationship to public health, safety, morals, or welfare the courts have a well-established basis for invalidating the regulation. Courts can, if they choose, preserve from such control the ordinary callings. Where the licensing is statewide and is to be done by a commission or agency composed of men already in the business to be licensed, the courts may well insist on being shown that the

regulation is in the interest of those public purposes nurtured by the police power. Of course, it may be argued that the trend of the times is in the direction of complete subordination of the individual to his government, that licensing regulation is part of the trend, and that courts can not thwart that trend. It is true that courts can not hold back the inevitable. But they can do much good in restraining mass inroads on individual liberty until those inroads have proved themselves inevitable."

Without doubt there are professions and occupations so affected with the public interest as to warrant their regulation for the public good. *S. v. Warren,* 211 N.C. 75, 189 S.E. 108; *Roach v. Durham,* 204 N.C. 587, 169 S.E. 149; *S. v. Lockey,* 198 N.C. 551, 152 S.E. 693; *S. v. Scott,* 182 N.C. 865, 109 S.E. 789; *S. v. Siler,* 169 N.C. 314, 84 S.E. 1015; *S. v. Hicks,* 143 N.C. 689, 57 S.E. 441; *S. v. Call,* 121 N.C. 643, 28 S.E. 517; *S. v. Van Doran,* 109 N.C. 864, 14 S.E. 32; *Ex Parte Schenck,* 65 N.C. 353.

On the other hand, "A state cannot under the guise of protecting the public arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions on them." *S. v. Ballance, supra; Palmer v. Smith,* 229 N.C. 612, 51 S.E. 2d 8; *S. v. Harris, supra; Skinner v. Thomas, supra; Glenn v. Express Co., supra; Liggett Co. v. Baldridge,* 278 U.S. 105; *Baking Co. v. Bryan,* 264 U.S. 504; *Board of Examiners v. Jewelers,* 183 Ga. 669, 189 S.E. 238; *People v. Griffith,* 280 Ill. 18, 117 N.E. 195; 11 Am. Jur., Constitutional Law, s. 336; *Ex parte Dickey,* 76 W. Va. 576; *The Case of the Tailors &c of Ipswich,* 11 Cokes Reports 53, 77 English Reports (Full Reprint) 1218. (Decided 1615.)

Admittedly there are borderline occupations in which the right to regulate is doubtful. In such cases rules of construction require that the regulation shall be upheld. But where, as here, no substantial public interest is shown to be involved or adversely affected, regulation is not justified. The fact that North Carolina was the first and is still the only State regulating tile contracting by license is not without persuasive effect. This State is under no obligation to wait until some other state "pioneers the field," but if regulation is in the public interest, it does seem strange indeed that no sister state has discovered the fact.

From what this Court has said, in the cases cited, it may be concluded that the police power, in seeking to extend its field of control, must not invade personal and property rights guaranteed and protected by Article I, Sections 1, 7, 17 and 31 of the Constitution of North Carolina. The Act in question here has as its main and controlling purpose not health, not safety, not morals, not welfare, but a tight control of tile contracting in perpetuity by those already in the business. The Act

unreasonably obstructs the common right of the plaintiff as well as of others to choose and follow as a means of livelihood an ordinary and harmless occupation. It tends to promote a monopoly in what is essentially a private business.

This Court, in the cases cited, has surveyed and marked the dividing line between the professions and skilled trades which in the public interest permit of regulation by licensing under the police power, and those ordinary lawful and innocuous occupations and trades which are protected from regulation by constitutional guarantees. The occupations and trades in the latter category constitute off-limits ground on which trespassing is forbidden by the Constitution. The police power of the State must stop at the line.

If the Legislature can take away the right to lay tile without license, then few, if any, trades remain in which man has the right to work. The effect of the licensing Act is to create a monopoly in a trade designed by the framers of the Constitution to be free from legislative control. Chapter 87, Article 3, is repugnant to Article I, Sections 1, 7, 17, and 31, Constitution of North Carolina, and, therefore, void. The judgment of the Superior Court of Richmond County is

Reversed.

RODMAN, J., took no part in the consideration or decision of this case.