IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-524

No. COA21-428

Filed 2 August 2022

Alamance County, No. 20 CVS 1001

KODY H. KINSLEY, in his official Capacity as SECRETARY OF THE NORTH
CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, Plaintiff,

v.

ACE SPEEDWAY RACING, LTD., AFTER 5 EVENTS, LLC, 1804-1814 GREEN
STREET ASSOCIATES LIMITED PARTNERSHIP, JASON TURNER, and ROBERT
TURNER, Defendants.

Appeal by Plaintiff from order entered 12 January 2021 by Judge John M.

Dunlow in Alamance County Superior Court. Heard in the Court of Appeals 8 March

2022.

Solicitor General Ryan Y. Park, by Assistant Solicitor General Nicholas S. Brod
and Solicitor General Fellow Zachary W. Ezor, and Attorney General Joshua
H. Stein, by Assistant Attorney General John P. Barkley, for Plaintiff-
Appellant.

Kitchen Law, PLLC, by S.C. Kitchen, for Defendants-Appellees.

Jeanette K. Doran for amicus curiae North Carolina Institute for Constitutional
Law.

GRIFFIN, Judge.

¶ 1        This case makes us consider the use of overwhelming power by the State

against the individual liberties of its citizens and how that use of power may be

challenged. The people of North Carolina recognized the importance of this balance in ratification of our Constitution in 1868. The challenged act here involves the closing of a business by a cabinet secretary. Plaintiff Kody H. Kinsley,[1] in his official capacity as Secretary of the North Carolina Department of Health and Human Services, issued an order of abatement to close a racetrack. The Secretary issued the abatement order only after the Governor's use of an executive order and his direct request to local law enforcement to close the track failed.

¶ 2        Amidst the onset of the COVID-19 pandemic, the Governor issued executive orders placing restrictions on the rights of the people of North Carolina to gather. The Secretary appeals from the trial court's order denying his motion to dismiss two counterclaims brought by Defendants Ace Speedway Racing, Ltd, its affiliates, and its owners. Ace's counterclaims propose that the Governor's orders were enforced upon them without justification and without equal protection of law. Ace's counterclaims are constitutional claims alleging (1) executive orders issued by the Governor in response to the COVID-19 pandemic were an unlawful infringement on Ace's right to earn a living as guaranteed by our Constitution's fruits of labor clause, and (2) the Secretary's enforcement actions against Ace under the executive order

---

[1] Secretary Mandy K. Cohen originally filed this appeal in her capacity as Secretary of the North Carolina Department of Health and Human Services. She has since been succeeded by Secretary Kinsley. We substitute Secretary Kinsley as party to this appeal in accordance with N.C. R. App. P. 38(c).

constituted unlawful selective enforcement. The Secretary argues Ace failed to present colorable constitutional claims, and therefore failed to overcome the Secretary's sovereign immunity from suit.

¶ 3 In this appeal, we are asked to decide whether Ace has presented colorable constitutional claims for which our courts could provide a remedy. We hold that Ace pled each of its constitutional claims sufficiently to survive the Secretary's motion to dismiss. We affirm the trial court's order.

## I. Factual and Procedural Background

¶ 4 Ace operates ACE Speedway in Alamance County as a racetrack, hosting car races with a maximum audience seating capacity of around 5,000 people. To feasibly host a race and pay its staff of roughly forty-five employees, Ace needs "around a thousand fans" to attend each race.

¶ 5 In March 2020, the COVID-19 virus began spreading across the United States. State governments across the country began to impose restrictions on their citizens' right to gather, conduct public activities, and engage in in-person means of commerce. On 20 May 2020, pursuant to emergency directive authority granted by N.C. Gen. Stat. § 166A-19.30, Governor Roy Cooper issued Executive Order 141 decreeing, in relevant part, that "mass gatherings" were temporarily prohibited in North Carolina. Exec. Order No. 141, 34 N.C. Reg. 2360 (May 20, 2020). Order 141 defined "mass gatherings" as "an event or convening that brings together more than ten (10) people

indoors or more than twenty-five (25) people outdoors at the same time in a single confined indoor or outdoor space, such as an auditorium, stadium, arena, or meeting hall." *Id.*

¶ 6        The mass gathering prohibition in Order 141 nullified Ace's ability to hold economically feasible racing events at ACE Speedway. On 22 May 2020, the Burlington Times-News published an article featuring statements from Defendant Jason Turner, an owner of ACE Speedway, regarding the restrictions in Order 141 and his plans to nonetheless hold races at ACE Speedway. The article quoted Turner as follows:

> I'm going to race and I'm going to have people in the stands.
> . . . And unless they can barricade the road, I'm going to do
> it. The racing community wants to race. They're sick and
> tired of the politics. People are not scared of something
> that ain't killing nobody. It may kill .03 percent, but we
> deal with more than that every day, and I'm not buying it
> no more.

Ace followed through on Turner's statement and began to hold races during the summer of 2020.

¶ 7        Ace held its first race of the season at ACE Speedway on 23 May 2020. The event drew an audience of approximately 2,550 spectators. On 15 May 2020, a week before the first race, Ace met with local health and safety officials. Ace and the local officials agreed upon health precautions for its events, including contact tracing, temperature screenings, social distancing in common areas, and reduced and

distanced audience seating arrangements. With each of its health precautions in place, Ace held races on May 23, May 30, and June 6, hosting over 1,000 spectators at each event.

¶ 8        On 30 May 2020, before that afternoon's race, the Governor's office requested that Alamance County Sheriff Terry Johnson personally ask Ace to stop holding racing events in violation of Order 141. The Sheriff relayed the Governor's message and informed Ace that they could face sanctions if they did not comply. After Ace held the race on May 30, the Sheriff publicly stated that he would not take any further actions to enforce Order 141. On 5 June 2020, the Governor's office sent a letter to the Sheriff and Ace, once again advising that Ace was conducting racing events in violation of Order 141 and potentially subject to sanctions. Ace held its third race on June 6, the following day.

¶ 9        On 8 June 2020, the Secretary issued an order demanding that Ace abate further mass gatherings at ACE Speedway. This Abatement Order explained that Ace had "operated openly in contradiction of the restrictions and recommendations in [Order 141,]" and, therefore, "immediate action" was necessary to prevent "increased exposure to thousands of people attending races at ACE Speedway, and thousands more who may be exposed to COVID-19 by family members, friends, and neighbors who have attended or will attend races at ACE Speedway." The Abatement Order instructed Ace to close its facilities until the expiration of Order 141, or until such

time as Ace developed a plan to host events in full compliance with Order 141's mass gathering restrictions. The Abatement Order also required Ace to "notify the public by 5:00 p.m. on [9 June 2020] that its upcoming races and other events . . . [were] cancelled[,]" and to notify DHHS by 5:00 p.m. on June 9 that it had complied. Ace declined to close its facilities or provide timely notice to the public and DHHS as required by the Abatement Order.

¶ 10        On 10 June 2020, the Secretary filed a complaint, motion for temporary restraining order, and motion for preliminary injunction seeking to enforce the terms of the Abatement Order. On 11 June 2020, Judge D. Thomas Lambeth, Jr., entered an order granting the Secretary's temporary restraining order and "enjoined [Ace] from taking any action to conduct or facilitate a stock car race or other mass gathering at ACE Speedway[.]" On 10 July 2020, following a hearing on the matter, Judge Lambeth entered an order granting the Secretary's motion for preliminary injunction and enjoining Ace "from taking any action prohibited by the Abatement Order[.]"

¶ 11        On 25 August 2020, Ace filed its answer to the Secretary's complaint and its own counterclaims, including the two constitutional claims at issue in this appeal: (1) infringement upon Ace's right to earn a living and (2) selective enforcement of Order 141 against Ace.

¶ 12        On 4 September 2020, the Governor issued Executive Order 163, which replaced Order 141 and loosened Order 141's mass gathering restrictions to allow a

total of fifty people in outdoor gatherings. The Secretary voluntarily dismissed his complaint in this matter against Ace because the terms of the Abatement Order were moot and no longer enforceable as written. Ace did not dismiss its counterclaims.

¶ 13 On 2 December 2020, the Secretary moved to dismiss Ace's counterclaims, arguing that each counterclaim was barred by sovereign immunity from suit. The trial court heard arguments on the justiciability of each claim. In January 2021, Judge John M. Dunlow entered an order (the "Denial Order") denying the Secretary's motion to dismiss each of Ace's constitutional claims.[2] The Secretary filed notice of appeal from the Denial Order on 17 February 2021.

## II. Analysis

¶ 14 The matter before us on appeal is whether the trial court erred by denying the Secretary's motion to dismiss Ace's two constitutional counterclaims on grounds of sovereign immunity from suit.

### A. Timeliness of Appeal

¶ 15 We first address the timeliness of the Secretary's appeal from the denial of his motion to dismiss Ace's counterclaims. Ace moves to dismiss the Secretary's appeal

---

[2] On 12 November 2020, Ace amended its counterclaims to assert three additional counterclaims. Following the hearing on justiciability, the trial court dismissed each additional counterclaim. Ace does not appeal the dismissal of these three counterclaims.

On 11 February 2021, Ace filed a motion for entry of default judgment against the Secretary. The trial court entered default judgment against the Secretary, but, following a hearing on the matter, allowed the Secretary's motion to set aside default.

on grounds that the Secretary's notice of appeal was untimely because he failed to comply with the terms of Rule 3(c) of the North Carolina Rules of Appellate Procedure.

¶ 16        "The provisions of Rule 3 are jurisdictional, and failure to follow the rule's prerequisites mandates dismissal of an appeal." *Bailey v. State*, 353 N.C. 142, 156, 540 S.E.2d 313, 322 (2000) (citation omitted). Rule 3(c) dictates that a party to a civil action "must file and serve a notice of appeal . . . within thirty days after entry of judgment [or order] if the party has been served with a copy of the judgment [or order] within the three-day period [after the order is entered]." N.C. R. App. P. 3(c)(1). Alternatively, if service was not made within three days, the party must file and serve a notice of appeal "within thirty days after service upon the party of a copy of the judgment." N.C. R. App. P. 3(c)(2). Effective service of a court document must include a certificate of service showing "the date and method of service or the date of acceptance of service and shall show the name and service address of each person upon whom the paper has been served." N.C. R. Civ. P. 5(b1). In the absence of properly effected service, the thirty-day period within which the party must file its appeal begins to run from the date the party obtained actual notice of the order. *Brown v. Swarn*, 257 N.C. App. 417, 421, 810 S.E.2d 237, 239 (2018) ("[W]here evidence in the record shows that the appellant received actual notice of the [order] more than thirty days before noticing the appeal, the appeal is not timely.").

¶ 17        Here, the record shows that the trial court entered the Denial Order on either 15 or 19 January 2021. The file stamp on the Denial Order is unclear and difficult to read. The record includes a certificate of service for the Denial Order filed on 15 January 2021. However, the trial court determined during the hearing to set aside entry of default against the Secretary that the package mailed to the Secretary containing the Denial Order did not include a copy of the certificate of service. The record does not indicate that the Secretary ever received the certificate of service for the Denial Order. Without a certificate of service, the Secretary never received effective service initiating the thirty-day period to file notice of appeal. Instead, the Secretary received actual notice of the Denial Order when he received the mailed package. Therefore, the thirty-day period to file notice of appeal from the Denial Order was tolled until February 4, only thirteen days before the Secretary filed a timely notice of appeal. This Court has jurisdiction over the Secretary's appeal.

¶ 18        The Secretary moved to dismiss Ace's claims under Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the North Carolina Rules of Civil Procedure, arguing the basis of sovereign immunity for each. The trial court denied the Secretary's motion in full. Nonetheless, the Secretary's arguments on appeal contend only that Ace failed to adequately plead its constitutional claims. We will therefore consider only whether Ace has properly pled claims for relief under Rule 12(b)(6). N.C. R. Civ. P. 12(b)(6) (allowing a party to defend a claim by contending the claimant "[f]ail[ed] to state a

claim upon which relief can be granted").

¶ 19    An appeal from the denial of a motion to dismiss is interlocutory, and ordinarily not ripe for immediate appellate review unless the appeal affects a substantial right. *Turner v. Hammocks Beach Corp.*, 363 N.C. 555, 558, 681 S.E.2d 770, 773 (2009). "This Court has consistently held that the denial of a [Rule 12(b)(6)] motion to dismiss based upon the defense of sovereign immunity affects a substantial right and is thus immediately appealable." *Richmond Cnty. Bd. of Educ. v. Cowell*, 225 N.C. App. 583, 586, 739 S.E.2d 566, 568 (2013) (citation, brackets, and quotation marks omitted). The Secretary's appeal is properly before this Court, and Ace's motion to dismiss the Secretary's appeal is denied.[3]

**B. Review of Constitutional Claims and Sovereign Immunity**

¶ 20    "This Court reviews a trial court's decision to grant or deny a motion to dismiss based upon the doctrine of sovereign immunity using a de novo standard of review." *State ex rel. Stein v. Kinston Charter Acad.*, 379 N.C. 560, 2021-NCSC-163, ¶ 23. "When reviewing a [Rule 12(b)(6)] motion to dismiss, an appellate court considers whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Deminski on behalf of C.E.D. v. State Bd. of Educ.*, 377 N.C. 406, 2021-NCSC-58, ¶ 12. (citations and

---

[3] The Secretary also filed a petition for writ of certiorari in the event that his appeal was deemed untimely. We dismiss the Secretary's petition as moot.

quotation marks omitted). North Carolina's rules of pleading require that a complaint "state enough to give the substantive elements of a *legally recognized claim*." *New Hanover Cnty. Bd. of Educ. v. Stein*, 380 N.C. 94, 2022-NCSC-9, ¶ 32.

¶ 21 "As a general rule, the doctrine of governmental, or sovereign[,] immunity bars actions against . . . the state, its counties, and its public officials sued in their official capacity." *Bunch v. Britton*, 253 N.C. App. 659, 666, 802 S.E.2d 462, 469 (2017) (citation omitted). However, our Courts have "held that the doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declaration of Rights of our Constitution." *Id.* (summarizing the North Carolina Supreme Court's holding in *Corum v. Univ. of N.C. Through Bd. of Governors*, 330 N.C. 761, 786, 413 S.E.2d 276, 292 (1992). "[W]hen there is a clash between . . . constitutional rights and sovereign immunity, the constitutional rights must prevail." *Corum v. Univ. of N.C. Through Bd. of Governors*, 330 N.C. 761, 786, 413 S.E.2d 276, 292 (1992).

> [T]his Court has long held that when public officials invade or threaten to invade the personal or property rights of a citizen in disregard of law, they are not relieved from responsibility by the doctrine of sovereign immunity even though they act or assume to act under the authority and pursuant to the directions of the State.

*Id.*

**C. Fruits of Their Labor Clause**

Ace's first constitutional claim alleges infringement of its "inalienable right to earn a living" under Article I, sections 1 and 19 of the North Carolina Constitution. Article I states:

> Section 1. The equality and rights of persons.
>
> We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, *the enjoyment of the fruits of their own labor*, and the pursuit of happiness.
>
> . . .
>
> Sec. 19. Law of the land; equal protection of the laws.
>
> No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

N.C. Const. art. 1, §§ 1, 19 (emphasis added). The right to "enjoyment of the fruits of their own labor" joined the enumeration of each North Carolina citizen's inalienable rights as part of revisions to the Constitution in 1868. *See* N.C. Const. of 1868. The drafters believed that, in the wake of slavery, no man could truly be free in this state without the right to both liberty and to reap the benefits of what he sowed. *See* Albion W. Tourgée, An Appeal to Caesar 244 (1884). North Carolinians have long valued and recognized the dignity of work.

¶ 23 With this in mind, the addition of a right to the fruits of one's labor to the North Carolina Constitution sought to increase the floor of protections granted by similar provisions in the United States federal constitution. U.S. Const. amend. XIV, § 1 (protecting citizens' rights to "life, liberty, or property" with due process of law). Since then, our courts have construed North Carolina citizens' right to the "fruits of their labor" to be synonymous with their "right to earn a living" in whatever occupation they desired. *See State v. Harris*, 216 N.C. 746, 759, 6 S.E.2d 854, 863 (1940) ("[T]he power to regulate a business or occupation does not necessarily include the power to exclude persons from engaging in it"). "The right to work and to earn a livelihood is a property right that cannot be taken away except under the police power of the State in the paramount public interest for reasons of health, safety, morals, or public welfare." *Roller v. Allen*, 245 N.C. 516, 518, 96 S.E.2d 851, 854 (1957). "'The right to conduct a lawful business or to earn a livelihood is regarded as fundamental.'" *Id.*, 245 N.C. at 518–19, 96 S.E.2d at 584 (citation omitted). "Arbitrary interference with private business and unnecessary restrictions upon lawful occupations are not within the police powers of the State." *State v. Warren*, 252 N.C. 690, 693, 114 S.E.2d 660, 663–64 (1960).

¶ 24 To effectively plead government intrusion on a constitutional right, the claimant's pleadings must show: (1) a state actor violated the claimant individual's constitutional rights; (2) the claim alleged substantively presents a "colorable"

constitutional claim; and (3) no adequate state remedy exists apart from a direct claim under the Constitution. *Deminski*, 2021-NCSC-58, ¶¶ 15–18.

Here, Ace's first claim alleged:

> 124. This counterclaim is brought against the [Secretary] in [his] official capacity as [he] was acting at all time relevant hereto as the Secretary of the North Carolina Department of Health and Human Services.
>
> 125. The [Abatement Order] is based on a violation of the Mass Gathering limits imposed by [Order 141] which required [Ace] to cease operating.
>
> 126. [Order 141 and the Abatement Order] deprive [Ace] of [its] inalienable right to earn a living as guaranteed by Art. I, sec. 1 and 19, of the North Carolina Constitution.
>
> . . .
>
> 129. [Order 141] and the [Secretary's Abatement Order] based on [Order 141] are unconstitutional as applied to [Ace] as neither the [Secretary] nor the Governor of the State possess the authority to deprive [Ace] of [its] right to pursue an ordinary vocation and earn a living.
>
> 130. The [Secretary] does not have sovereign immunity as this counterclaim is brought directly under the Declaration of Rights of the North Carolina Constitution.
>
> 131. [Ace does] not have an adequate state remedy, and therefore, there is a direct cause of action against the [Secretary] for the violation of [Ace's] rights as guaranteed by Art. I, sec. 1 and 19, of the North Carolina Constitution.

Ace pled that its rights were violated by the Secretary in his official capacity as a state actor. Ace also pled its lack of an alternative, adequate state remedy

through which it could seek relief. We agree that Ace has no other avenue to seek relief for the Secretary's allegedly improper enforcement apart from a direct action under the Constitution.

¶ 27        Ace has also pled a colorable, though admittedly novel, claim for government intrusion on its right to earn a living. It is well-established that the fruits of their labor clause applies when our government, most often the legislature, enacts a scheme of legislation or regulation that purports to protect the public from undesirable actors within occupations. *See Poor Richard's, Inc. v. Stone*, 322 N.C. 61, 65, 366 S.E.2d 697, 699 (1988) (concerning legislation regarding manufacture of goods for military use); *Warren*, 252 N.C. at 695, 114 S.E.2d at 665 (1960) (concerning licensure legislation for real estate brokers); *State v. Ballance*, 229 N.C. 764, 51 S.E.2d 731 (1949) (concerning legislation creating licensure requirements for photographers). Likewise, our courts have more recently held that the clause also applies when a government employer denies a state employee due process with respect to the terms and procedures of his or her employment. *See Mole' v. City of Durham*, 279 N.C. App. 583, 2021-NCCOA-527, ¶ 29, *disc. rev. granted, Mole v. City of Durham*, 868 S.E.2d 851 (N.C. 2022); *Tully v. City of Wilmington*, 370 N.C. 527, 535–36, 810 S.E.2d 208, 215 (2018) ("Article I, Section 1 also applies when a governmental entity acts in an arbitrary and capricious manner toward one of its employees by failing to abide by promotional procedures that the employer itself put

in place."). It naturally follows that actions taken by other non-legislative state actors, whether elected officials or unelected bureaucrats, may run afoul of a citizen's right to the fruits of his own labor when they arbitrarily interfere with occupations, professions, or the operation of business.

¶ 28        The core principle behind the fruits of their labor clause is that government "'may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations.'" *Cheek v. City of Charlotte*, 273 N.C. 293, 296, 160 S.E.2d 18, 21 (1968) (quoting *Lawton v. Stell*, 152 U.S. 133, 137 (1894)). The present case involves enforcement action taken under the authority of an executive order issued by the Governor, rather than laws promulgated by the legislature. The intended purpose of the Governor's order was not to regulate a particular occupation or business enterprise, but the direct and intended purpose of the Abatement Order was to cease the operation of a business. It cannot be denied that the scope and breadth of the Abatement Order restricted or otherwise interfered with the lawful operation of a business serving the public.

¶ 29        The Secretary argues that Ace's first claim should be decided at the 12(b)(6) stage as a matter of law. To this end, the Secretary contends that this Court may take judicial notice of factual data surrounding the COVID-19 pandemic at the time the Abatement Order was issued, which will unequivocally support the Secretary's

decisions. *See Rhyne v. K-Mart Corp.*, 358 N.C. 160, 182, 594 S.E.2d 1, 16 (2004) (stating this Court may consider all matters before the state actor as well as matters of which it may take judicial notice when reviewing constitutionality). We disagree. Ace pled that the Abatement Order was the foundational authorization to force Ace to cease operating its racetrack and that the was Order unconstitutional as applied to Ace. An examination of the facts surrounding the COVID-19 pandemic at a later stage of trial may show that Ace's precautionary measures to manage contact tracing of its attendees; install plexiglass, touchless thermometers, six-feet distance markers, and screening booths; and to initiate vigilant cleaning procedures—all in consult with local health officials—were sufficient to combat the spread of COVID-19 within an open-air racetrack in Alamance County. Presuming these facts in favor of Ace as the non-movant, the reasonableness of an "imminent hazard" as justification for the Secretary's actions can be questioned. We hold that Ace adequately pled that the Secretary, through his Abatement Order, deprived Ace of its constitutional right to the fruits of one's own labor and, therefore, sovereign immunity cannot bar Ace's claim. *Deminski*, 2021-NCSC-58, ¶ 21.

**D. Selective Enforcement**

¶ 30      Ace's second constitutional claim alleges that the Secretary's Abatement Order, levied against Ace and no other speedways, ran afoul of Article 1, section 19's decree that "[n]o person shall be denied the equal protection of the laws[.]" N.C.

Const. art. 1, § 19. Through its second claim, Ace once again sufficiently pleads a constitutional challenge to the Secretary's method of enforcing Order 141.

¶ 31        Selective enforcement of the law by the State is barred by an individual's right to equal protection when enforcement is based upon an arbitrary classification. *State v. Garner*, 340 N.C. 573, 588, 459 S.E.2d 718, 725 (1995) (citations omitted). "Such arbitrary classifications include prosecution due to a defendant's decision to exercise his statutory or constitutional rights." *Id.* (citing *United States v. Goodwin*, 457 U.S. 368, ___ (1982)); *Roller*, 245 N.C. at 518, 96 S.E.2d at 854 (stating right to earn a living is a constitutional right). Our Supreme Court has set out the two-part test for selective enforcement as (1) a singling out of the defendant for (2) discriminatory, invidious reasons:

> The generally recognized two-part test to show discriminatory selective prosecution is (1) the defendant must make a *prima facie* showing that he has been singled out for prosecution while others similarly situated and committing the same acts have not; (2) upon satisfying (1) above, he must demonstrate that the discriminatory selection for prosecution was invidious and done in bad faith in that it rests upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*State v. Howard*, 78 N.C. App. 262, 266–67, 337 S.E.2d 598, 601–02 (1985) (citations omitted). "Mere laxity in enforcement does not satisfy the elements of a claim of selective or discriminatory enforcement in violation of the equal protection clause."

*Grace Baptist Church of Oxford v. City of Oxford*, 320 N.C. 439, 445, 358 S.E.2d 372, 376 (1987). Rather, the claimant must show that a state actor applied the law with "a pattern of conscious discrimination" evidencing administration "with an evil eye and an unequal hand." *Id.* (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)) (some citations omitted).

¶ 32      Ace's claim alleged:

> 136. Many speedways in addition to ACE Speedway have been conducting races with fans in attendance without any enforcement action by the [Secretary].
>
> 137. [Ace was] singled out by the Governor for enforcement after comments . . . made by Defendant Robert Turner[] were made public.
>
> 138. The Governor took the unusual step of having a letter sent to the Sheriff of Alamance County directing him to take action against [Ace].
>
> 139. [Ace is] informed and believe that no other [s]peedway has been the subject of an Order of Abatement of Imminent Hazard by the [Secretary].
>
> 140. [Ace is] informed and believe[s] that the [Abatement Order] was issued by the [Secretary] . . . due to the statements of Defendant Robert Turner and not because a true Imminent Hazard exists.
>
> 141. The issuance of the [Abatement Order] violates the equal protection rights of [Ace] as guaranteed by Article I, Section 19 of the North Carolina Constitution.
>
> 142. The [Secretary] does not have sovereign immunity as this counterclaim is brought directly under the Declaration

of Rights of the North Carolina Constitution.

> 143. [Ace does] not have an adequate state remedy, and therefore, there is a direct cause of action against the [Secretary] for the violation of [Ace's] rights as guaranteed by Art. I, sec. 19, of the North Carolina Constitution.

¶ 33 Ace once again pleads that its rights were violated by the Secretary in his official capacity as a state actor, and that it has no avenue for redress other than an action under the Constitution.

¶ 34 With respect to whether Ace's substantive claim is colorable, the Secretary argues that Ace failed to plead both (1) that it was "singled out" for prosecution while "similarly situated" to other raceways, and (2) that the Secretary acted invidiously in "bad faith." The Secretary's argument places special emphasis on Ace's failure to track specific language in pleading its claim. We have held that a party need not use magic words to plead the substantive elements of its claim. *See Feltman v. City of Wilson*, 238 N.C. App. 246, 253–54, 767 S.E.2d 615, 621 (2014); s*ee also State v. Dale*, 245 N.C. App. 497, 504, 783 S.E.2d 222, 227 (2016) ("This notice pleading has replaced the use of 'magic words' and allows for a less exacting standard, so long as the defendant is properly advised of the charge against him or her."). A pleading is sufficient "if it gives sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand the nature of it and the basis for it, to file a responsive pleading, and—by using the rules provided for obtaining pretrial

discovery—to get any additional information he may need to prepare for trial." *Sutton v. Duke*, 277 N.C. 94, 104, 176 S.E.2d 161, 167 (1970) ("Under the 'notice theory' of pleading contemplated by [N.C. R. Civ P.] 8(a)(1), detailed fact-pleading is no longer required.").

¶ 35          The Secretary's argument fails. Ace pled "enough to give the substantive elements of a *legally recognized claim*" for selective enforcement. *See Stein*, 2022-NCSC-9, ¶ 32. Ace effectively pled that it was among a class of "many speedways" that similarly conducted races with fans in attendance during the period where such actions were banned by Order 141. Ace further pled that Governor Cooper and the Secretary "singled out" Ace for enforcement by directing the Sheriff to take action against Ace and, when that failed, by issuing the Abatement Order against Ace alone. Finally, Ace's complaint pled its belief that it was singled out for enforcement in response to Defendant Turner's statements to the press "and not because a true Imminent Hazard exist[ed,]" as the Secretary asserted in the Abatement Order. These pleadings, taken as true, sufficiently allege bad faith enforcement of Order 141 against Ace alone.

¶ 36          The Secretary contends that Ace's pled discriminatory reason for his enforcement of Order 141—retaliation for statements made to the press critiquing Order 141—is insufficient to plead selective enforcement. The Secretary cites *State v. Davis*, 96 N.C. App. 545, 550, 386 S.E.2d 743, 745 (1989), for support. In *Davis*,

following his conviction for tax-related offenses, the defendant argued on appeal that he was selectively prosecuted based upon "invidious discrimination" because he belonged to a political group that routinely and openly protested personal income tax laws. *Id.* at 548–49, 386 S.E.2d at 744. This Court ruled that the defendant's evidence at trial failed to show more than a tenuous relationship between his association with the anti-tax political group and the State's decision to prosecute him instead of any number of other citizens who failed to file their tax returns. Therefore, the defendant could not show he was "singled out" for prosecution. *Id.* at 549, 386 S.E.2d at 744–45.

¶ 37 Further, and most relevant to the present case, the Court held that the defendant presented "a feckless argument that the statutes he was charged under [were] unconstitutional as applied to him because selection for his prosecution was impermissibly based on an attempt to suppress his first amendment right of free speech." *Id.* at 549, 386 S.E.2d at 745. Even assuming that the defendant was singled out for his vocal protest of income taxes, the Court found no invidiousness or bad faith because "such prosecutions, predicated in part upon a potential deterrent effect, serve a legitimate interest in promoting more general tax compliance." *Id.* at 550, 386 S.E.2d at 745.

¶ 38 The facts of *Davis* are similar to the facts of the present case. Ace pleads that it was selected for enforcement by the Secretary because its owner was outspokenly

critical of Order 141. The Secretary asserts that Ace must fail for the same reason the defendant's argument failed in *Davis*: regardless of possible alternative reasons for enforcement, singling out outspoken individuals has a strong deterrent effect upon those who are similarly situated and choose similar courses of action.

¶ 39 The present case must be distinguished from *Davis* based upon the relevant stage of the proceedings. The Court in *Davis* reached its holding following appellate review of evidence admitted during a full trial, and after determining that any effort to reduce the defendant's speech was, at most, an equal and alternative purpose to deterrence of criminal conduct. Here, we are tasked only with determining whether Ace has sufficiently pled the substantive elements of its claim. Ace has pled that the Secretary acted based solely upon an effort to silence its opposition to Order 141, and not based upon any alternative, legitimate state interest. The resolution of this question is not before us at this time. Ace has sufficiently pled that the Secretary singled its racetrack out for enforcement in bad faith for the invidious purpose of silencing its lawful expression of discontent with the Governor's actions. Therefore, sovereign immunity cannot bar Ace's claim.

### III. Conclusion

¶ 40 We hold that Ace pled colorable claims for infringement of its right to earn a living and for selective enforcement of the Governor's orders sufficient to survive the Secretary's motion to dismiss.

AFFIRMED.

Judges CARPENTER and GORE concur.