IN THE SUPREME COURT OF NORTH CAROLINA

No. 252A23

Filed 22 August 2025

TIFFANY HOWELL; CHESTER'S INC.; TRH, INC.; JACQUELINE DANIELLE BULL; J. DANIELLE LLC; JASON RUTH; BIG BOYZ, L.L.C.; MATTHEW MOREL; WILD CHERRY LN, L.L.C.; BENJAMIN REESE; MR ENTERTAINMENT, LLC; TONY BASFORD; PLUS DUELING PIANOS, INC.; BRYAN WHEELOCK; GREY GHOST ENTERTAINMENT, LLC; DREWRY WOFFORD, IV; NC HOUSE PARTY LLC

v.

ROY A. COOPER, III, in his official capacity as Governor; STATE OF NORTH CAROLINA; TIM MOORE, in his official capacity as Speaker of the House of Representatives; PHIL BERGER, in his official capacity as President Pro Tempore of the Senate

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 290 N.C. App. 287, 892 S.E.2d 445 (2023), affirming an order entered on 16 February 2022 by Judge Joshua W. Willey Jr. in Superior Court, Carteret County. On 30 May 2024, the Supreme Court allowed defendants' petition for discretionary review as to additional issues. Heard in the Supreme Court on 23 October 2024.

*Kitchen Law, PLLC, by S.C. Kitchen, for plaintiff-appellees.*

*Jeff Jackson, Attorney General, by Nicholas S. Brod, Solicitor General, James W. Doggett, Deputy Solicitor General, and Matthew Tulchin and Michael T. Wood, Special Deputy Attorneys General, for defendant-appellants Joshua H. Stein and State of North Carolina.*

NEWBY, Chief Justice.

The complaint in this case alleges that defendants impermissibly abridged plaintiffs' fundamental rights to earn a living when, in response to the novel coronavirus disease (COVID-19), the Governor issued executive orders that either overtly ordered plaintiffs to close their bars or so severely restricted their operations that plaintiffs found it no longer practicable to remain open.[1] Defendants insist that plaintiffs' claims are barred under the doctrine of sovereign immunity and must be dismissed. Under our caselaw, however, plaintiffs may bring a direct claim against the State under the state constitution if they colorably allege that a state actor violated their state constitutional rights, thereby causing injury for which there is no other adequate, alternative state remedy. Sovereign immunity does not bar these so-called "*Corum* claims." There is no dispute here that defendants are state actors and that plaintiffs lack an adequate, alternative state remedy. Furthermore, applying standards crystallized in *Kinsley v. Ace Speedway Racing, Ltd.*, 386 N.C. 418, 904 S.E.2d 720 (2024), and reiterated today in *N.C. Bar & Tavern Ass'n v. Stein*, No. 126PA24 (N.C. Aug. 22, 2025), we conclude that plaintiffs' claims are colorable

---

[1] References to "defendants" are only to the State and former Governor Roy Cooper and do not include the Speaker of the House of Representatives or the President Pro Tempore of the Senate, who were named as defendants by plaintiffs' amended complaint but are not parties to this appeal.

Also, pursuant to Rule 38(c) of the Rules of Appellate Procedure, former Governor Cooper and former Speaker of the House of Representatives Tim Moore are no longer parties to this case. Instead, their successors—Governor Josh Stein and Speaker of the House of Representatives Destin Hall, respectively—have been automatically substituted as parties. Throughout this opinion, however, references to "the Governor" are to former Governor Cooper, and references to "the Speaker of the House" are to former Speaker Moore.

because the complaint pleads facts that, under current law, are sufficient to support the alleged violations of their rights to earn a living. Therefore, plaintiffs satisfy the pleading requirements, and sovereign immunity does not bar their claims. The decision of the Court of Appeals allowing plaintiffs' claims to proceed past the pleading stage is modified and affirmed.

According to the complaint's factual allegations, which we must treat as true and view in the light most favorable to plaintiffs, *see Kinsley*, 386 N.C. at 420, 904 S.E.2d at 724 (citing *Deminski ex rel. C.E.D. v. State Bd. of Educ.*, 377 N.C. 406, 412, 858 S.E.2d 788, 792–93 (2021)), the Governor invoked his powers under the North Carolina Emergency Management Act and declared a state of emergency throughout North Carolina on 10 March 2020 due to COVID-19.[2] One week later, the Governor attempted to slow the spread of the virus by ordering bars to close statewide.[3] Plaintiffs, who own or operate bars throughout North Carolina, were forced to close their businesses.

Almost two months later, on 8 May 2020, the Governor permitted bars to reopen but directed them "to not serve alcoholic beverages for onsite consumption."[4]

---

[2] Exec. Order No. 116, 34 N.C. Reg. 1744, 1744–49 (Apr. 1, 2020) (effective Mar. 10, 2020) (citing N.C.G.S. §§ 166A-19.10, -19.20 (2019)).

[3] Exec. Order No. 118, 34 N.C. Reg. 1834, 1835–36 (Apr. 15, 2020) (effective Mar. 17, 2020); Exec. Order No. 121, 34 N.C. Reg. 1903, 1906, 1909, 1911 (May 1, 2020) (effective Mar. 30, 2020); Exec. Order No. 135, 34 N.C. Reg. 2086, 2087 (May 15, 2020) (effective Apr. 23, 2020).

[4] Exec. Order No. 138, 34 N.C. Reg. 2141, 2141–42, 2148 (June 1, 2020) (effective May 8, 2020).

In practice, this order required plaintiffs to keep their bars closed. Later that month, the Governor closed "entertainment . . . facilities that operate within a confined indoor or outdoor space and do not offer a retail or dining component"—including bars. The Governor also "solely direct[ed] that bars [were] not to serve alcoholic beverages for onsite consumption."[5] The Governor extended these restrictions through 2 October 2020.[6]

That same day, the Governor permitted bars to open and serve alcohol for onsite consumption in outdoor seating areas. The Governor's executive order limited outdoor occupancy, however, and kept indoor seating areas closed.[7] Several plaintiffs were able to open under these relaxed restrictions, but harsh weather severely limited their operations. The remaining plaintiffs were unable to open at all because

---

[5] Exec. Order No. 141, 34 N.C. Reg. 2360, 2360, 2371–72 (June 15, 2020) (effective May 22, 2020).

[6] Exec. Order No. 147, 35 N.C. Reg. 154, 158 (Aug. 3, 2020) (effective June 26, 2020); Exec. Order No. 151, 35 N.C. Reg. 316, 319 (Aug. 17, 2020) (effective July 17, 2020); Exec. Order No. 155, 35 N.C. Reg. 535, 538 (Sept. 1, 2020) (effective Aug. 7, 2020); Exec. Order No. 163, 35 N.C. Reg. 713, 731, 733–34 (Oct. 1, 2020) (effective Sept. 4, 2020); *cf.* Exec. Order No. 153, 35 N.C. Reg. 523, 527–28 (Sept. 1, 2020) (effective July 31, 2020) (directing other businesses that sold or served alcoholic beverages to cease the sale and service for onsite consumption between 11:00 p.m. and 7:00 a.m. but prohibiting bars from operating even under these restrictions); Exec. Order No. 162, 35 N.C. Reg. 708, 712 (Oct. 1, 2020) (effective Aug. 31, 2020) (extending Executive Order 153 through 2 October 2020).

[7] Exec. Order No. 169, 35 N.C. Reg. 900, 900, 902, 911 (Nov. 2, 2020) (effective Oct. 2, 2020).

they did not have outdoor seating areas. The Governor extended these restrictions through 4 December 2020.[8]

Starting 11 December 2020, the Governor required bars to stop serving alcohol between 9:00 p.m. and 7:00 a.m.[9] This restriction made it unprofitable for plaintiffs to operate their bars.

On 22 December 2020, plaintiffs sued defendants to challenge the foregoing executive orders. Among other claims, plaintiffs alleged that the executive orders violated their fundamental rights to earn a living as guaranteed by Article I, Sections 1 and 19 of the North Carolina Constitution (the Fruits of Their Own Labor Clause and the Law of the Land Clause, respectively).[10] Plaintiffs sought money damages, a permanent injunction, declaratory judgments, and any other relief the trial court deemed proper.

---

[8] Exec. Order No. 170, 35 N.C. Reg. 1032, 1035 (Nov. 16, 2020) (effective Oct. 23, 2020); Exec. Order No. 176, 35 N.C. Reg. 1334, 1337 (Dec. 15, 2020) (effective Nov. 13, 2020).

[9] Exec. Order No. 181, 35 N.C. Reg. 1524, 1536–37, 1546–47 (Jan. 15, 2021) (effective Dec. 11, 2020).

[10] Plaintiffs styled their claims under the Law of the Land Clause as "substantive due process" claims. *See generally Askew v. City of Kinston*, 386 N.C. 286, 294, 902 S.E.2d 722, 729 (2024) ("[R]ooted in Article I, Section 19, . . . . [s]ubstantive due process 'is a guaranty against arbitrary legislation, demanding that the law be substantially related to the valid object sought to be obtained.' In essence, it guards against unreasonable government actions that deprive people of life, liberty, or property." (quoting *Lowe v. Tarble*, 313 N.C. 460, 461, 329 S.E.2d 648, 650 (1985)). In addition to their claims based on the right to earn a living, plaintiffs challenged the constitutionality of portions of the North Carolina Emergency Management Act, and they claimed that the Governor's executive orders violated the state constitution's Equal Protection Clause. N.C. Const. art. I, § 19.

On 28 January 2021, defendants moved to dismiss plaintiffs' complaint under Rules 12(b)(1), 12(b)(2), and 12(b)(6). Plaintiffs later amended their complaint to add the then-Speaker of the House of Representatives, Tim Moore, and President Pro Tempore of the Senate, Phil Berger Sr., as additional defendants. On 14 May 2021, the Governor allowed bars to fully reopen.[11] Defendants subsequently renewed their motion to dismiss the then-amended complaint.

At the hearing on the motion to dismiss, defendants argued, *inter alia*, that plaintiffs' damages claims should be dismissed under the doctrine of sovereign immunity. On 16 February 2022, the trial court denied defendants' motion to dismiss in part, thereby allowing plaintiffs' claims under the Fruits of Their Own Labor Clause and Law of the Land Clause to proceed.[12] Defendants appealed.[13]

In a divided decision, the Court of Appeals affirmed. *Howell v. Cooper*, 290 N.C. App. 287, 298, 892 S.E.2d 445, 454 (2023). The majority observed that sovereign immunity would not bar plaintiffs' action if they stated *Corum* claims, and it noted

---

[11] Exec. Order No. 215, 35 N.C. Reg. 2651, 2655–58 (June 15, 2021) (effective May 14, 2021).

[12] The trial court granted defendants' motion to dismiss plaintiffs' equal protection claims, and it dismissed plaintiffs' request for a permanent injunction as moot. The trial court transferred plaintiffs' challenges to the constitutionality of the North Carolina Emergency Management Act to a three-judge panel of the Superior Court of Wake County. *See generally* N.C.G.S. § 1-267.1(a) (2023) (requiring facial challenges to the validity of acts of the General Assembly to be heard by a three-judge panel of the Superior Court of Wake County).

[13] The Speaker of the House and President Pro Tempore of the Senate did not join in the motion to dismiss, nor did they appeal the trial court's order. Plaintiffs did not appeal the order's other components.

that to successfully plead a *Corum* claim upon which relief could be granted, plaintiffs' complaint needed to allege three things: (1) state action, (2) colorable constitutional claims, and (3) the absence of other adequate state remedies. *Howell*, 290 N.C. App. at 292–94, 892 S.E.2d at 450–52 (citing *Deminski*, 377 N.C. at 413–14, 858 S.E.2d at 793–94). Before analyzing these requirements, the majority rejected defendants' argument that plaintiffs were required to seek the "least intrusive" remedy in order for their suit to proceed. *Id.* at 293, 892 S.E.2d at 451.

The majority then concluded that plaintiffs satisfied the three pleading requirements. *Id.* at 294–97, 892 S.E.2d at 452–53. First, it held that the complaint sufficiently alleges state action. *Id.* at 295, 892 S.E.2d at 452. Second, the majority concluded that plaintiffs' complaint alleges colorable constitutional claims. *Id.* at 295–97, 892 S.E.2d at 452–53. Specifically, the majority held that plaintiffs allege colorable violations of the Fruits of Their Own Labor Clause because the executive orders operated as a "blanket prohibition . . . of an entire economic sector." *Id.* at 296, 892 S.E.2d at 453. The majority concluded that plaintiffs also allege colorable substantive due process claims under the Law of the Land Clause because "[they] have . . . *fundamental* right[s] to earn a living from the operation of their respective bar businesses." *Id.* at 297, 892 S.E.2d at 453 (emphasis added). Third, the majority "agree[d] there is no other adequate state remedy." *Id.* at 297, 892 S.E.2d at 453. Accordingly, the majority concluded that sovereign immunity did not bar plaintiffs' action and thus affirmed the trial court. *Id.* at 297–98, 892 S.E.2d at 453–54.

The dissent would have reversed the trial court's ruling on defendants' Rule 12(b)(6) motion. *Id.* at 298, 892 S.E.2d at 454 (Arrowood, J., dissenting). It applied rational basis review and concluded that plaintiffs failed to state colorable claims under both constitutional provisions. *Id.* at 300–02, 892 S.E.2d at 455–56.

Defendants appealed based on the dissent.[14] They also petitioned this Court for discretionary review of additional issues: (1) whether "the Court of Appeals err[ed] by holding that, to state a direct constitutional claim under *Corum v. University of North Carolina*, 330 N.C. 761, 413 S.E.2d 276 (1992), plaintiffs do not have to allege that they seek the least-intrusive remedy available to address the deprivation of their rights," and (2) whether "plaintiffs fail[ed] to seek the least-intrusive remedy available to them on the facts of this case." This Court allowed defendants' petition on 30 May 2024. Ultimately, we must determine if plaintiffs' complaint withstands defendants' motion to dismiss.

Although this case requires us to consider unprecedented facts, the legal principles at issue are not unique. Under the Rules of Civil Procedure, a complaint must "contain . . . [a] short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of

---

[14] *See generally* N.C.G.S. § 7A-30(2) (2023) (providing a right of appeal when there is a dissent at the Court of Appeals), *repealed by* Current Operations Appropriations Act of 2023, S.L. 2023-134, § 16.21(d), https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2023-2024/SL2023-134.pdf. The repeal of N.C.G.S. § 7A-30(2) applies only to cases filed with the Court of Appeals on or after 3 October 2023. *See* Current Operations Appropriations Act § 16.21(e).

transactions or occurrences, intended to be proved showing that the pleader is entitled to relief." N.C.G.S. § 1A-1, Rule 8(a)(1) (2023). The Rules do not require hyper-technical, formulaic pleading. *Stanback v. Stanback*, 297 N.C. 181, 204, 254 S.E.2d 611, 626 (1979) (recognizing "the liberal nature of the concept of notice pleading"), *disapproved of on other grounds by, Dickens v. Puryear*, 302 N.C. 437, 448, 276 S.E.2d 325, 332 (1981). To the contrary,

> [u]nder the 'notice theory' of pleading contemplated by Rule 8(a)(1), detailed fact-pleading is no longer required. A pleading complies with the rule if it gives sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand the nature of it and the basis for it, to file a responsive pleading, and—by using the rules provided for obtaining pretrial discovery—to get any additional information he may need to prepare for trial.

*Sutton v. Duke*, 277 N.C. 94, 104, 176 S.E.2d 161, 167 (1970).[15]

Rule 12(b)(6) requires a trial court to dismiss a complaint that "[f]ail[s] to state a claim upon which relief can be granted." N.C.G.S. § 1A-1, Rule 12(b)(6) (2023). "The only purpose of a Rule 12(b)(6) motion," however, "is to test the *legal* sufficiency of the pleading against which it is directed. . . . 'The function of a motion to dismiss is to test the law of a claim, *not the facts which support it.*'" *White v. White*, 296 N.C. 661, 667, 252 S.E.2d 698, 702 (1979) (emphases added) (quoting *Niece v. Sears, Roebuck & Co.*, 293 F. Supp. 792, 794 (N.D. Okla. 1968)). Ultimately, a complaint is

---

[15] When "[p]leading special matters," the Rules impose heightened pleading standards on parties. N.C.G.S. § 1A-1, Rule 9 (2023). No such special matters are present in this case. *See id.*

legally sufficient so long as it "state[s] enough to give the substantive elements of at least some legally recognized claim." *Stanback*, 297 N.C. at 204, 254 S.E.2d at 626.

To that end, a plaintiff does not have to prove his case at the pleading stage, and "few [complaints] fail to survive a motion to dismiss" under Rule 12(b)(6). *Ladd v. Est. of Kellenberger*, 314 N.C. 477, 481, 334 S.E.2d 751, 755 (1985). When reviewing a Rule 12(b)(6) motion, we treat the complaint's factual allegations as true and view them in the light most favorable to the plaintiff. *Taylor v. Bank of Am., N.A.*, 385 N.C. 783, 787, 898 S.E.2d 740, 744 (2024). Moreover, we construe the complaint liberally. *U.S. Bank Nat'l Ass'n v. Pinkney*, 369 N.C. 723, 726, 800 S.E.2d 412, 415 (2017). Dismissal under Rule 12(b)(6) is warranted only when (1) it appears *certain* that plaintiffs could prove no set of facts which would entitle them to relief under some legal theory; (2) *no* law exists to support the claim made; or (3) the complaint on its face discloses facts that *necessarily* defeat the claim. *Id.*; *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448, 781 S.E.2d 1, 8 (2015). If none of these conditions are present, a plaintiff may at least have the case proceed past the pleading stage. In other words, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Stanback*, 297 N.C. at 185, 254 S.E.2d at 615 (emphasis omitted) (quoting 2A Moore's Federal Practice § 12.08, at 2271–74 (2d ed. 1975)).

Thus, a complaint survives a motion to dismiss under Rule 12(b)(6) if the alleged facts tend to show a colorable legal claim and allow a defendant to understand the claim's nature and prepare its defense. Like other Rule 12(b)(6) motions, "[w]e review de novo a trial court's denial of a motion to dismiss that raises [sovereign] immunity as a ground for dismissal." *Wynn v. Frederick*, 385 N.C. 576, 580, 895 S.E.2d 371, 376 (2023) (citing *White v. Trew*, 366 N.C. 360, 362–63, 736 S.E.2d 166, 168 (2013)).

Having explained our standard of review, we now review the substantive law by which plaintiffs' complaint must be judged. The intricacies of *Corum* claims and the standards applicable to *Corum* claims predicated on the fundamental right to earn a living are more exhaustively explained in *N.C. Bar & Tavern*, which this Court issues contemporaneously with this case. Slip op. at 11–18. We incorporate *N.C. Bar & Tavern*'s discussion here by reference and focus instead only on those rules pertinent to the present inquiry.

To successfully plead a valid *Corum* claim, a plaintiff must allege (1) state action, (2) a "colorable" state constitutional claim, and (3) the absence of any other "adequate state remedy." *Kinsley*, 386 N.C. at 423, 904 S.E.2d at 726 (quoting *Deminski*, 377 N.C. at 413, 858 S.E.2d at 793–94). To be colorable, "the claim must present facts sufficient to support an alleged [harmful] violation of a right protected by the [s]tate [c]onstitution" under "the current law (or a reasonable and logical

extension or modification [thereof]).”[16] *Deminski*, 377 N.C. at 413, 858 S.E.2d at 793–94 (quoting *Claim*, *Black's Law Dictionary* (11th ed. 2019)); *see also N.C. Bar & Tavern Ass'n*, slip op. at 12 (N.C. Aug. 22, 2025) (“To be colorable, a plaintiff must ‘present facts sufficient to support an alleged violation of a right protected by the [s]tate [c]onstitution.’ ” (quoting *Kinsley*, 386 N.C. at 423, 904 S.E.2d at 726). “If a claimant satisfies these three criteria, sovereign immunity ‘does not bar the claim’ and the trial court must deny a motion to dismiss based on sovereign immunity.” *Kinsley*, 386 N.C. at 423, 904 S.E.2d at 726 (quoting *Deminski*, 377 N.C. at 407, 858 S.E.2d at 790).

Because the first and third pleading requirements are not at issue here, we must determine only whether plaintiffs' claims are colorable. Normally, when a claimant asserts multiple *Corum* claims, the court must disaggregate and analyze them individually. *Askew v. City of Kinston*, 386 N.C. 286, 293–94, 902 S.E.2d 722, 728–29 (2024). But because the test applied to determine the validity of a state action burdening the fundamental right to earn a living when the State is acting as a regulator or sovereign is the same under both the Fruits of Their Own Labor Clause and Law of the Land Clause, *Poor Richard's, Inc. v. Stone*, 322 N.C. 61, 64, 366 S.E.2d 697, 698–99 (1988); *see also* John V. Orth & Paul Martin Newby, *The North Carolina*

---

[16] Plaintiffs' complaint predated our decision in *Kinsley*, so plaintiffs did not structure their complaint around the standards articulated therein. We emphasize for future litigants, however, that complaints based on alleged violations of the fundamental right to earn a living as protected by the Fruits of Their Own Labor Clause and Law of the Land Clause must be crafted with an eye towards the standards articulated in *Kinsley* and this opinion.

*State Constitution* 46–47 (2d ed. 2013) [hereinafter *State Constitution*], we consider plaintiffs' claims together for the purposes of our Rule 12(b)(6) analysis. But ultimately, of course, each must be separately proved.

Our state constitution enshrines the fundamental right "to conduct a lawful business or to earn a livelihood" as one of the "first principles of freedom." *N.C. Bar & Tavern*, slip op. at 15 (quoting *Treants Enters., Inc. v. Onslow Cnty.*, 83 N.C. App. 345, 354, 350 S.E.2d 365, 371 (1986), *aff'd*, 320 N.C. 776, 360 S.E.2d 783 (1987)). The protections afforded to this right, which are guaranteed by both the Fruits of Their Own Labor Clause and Law of the Land Clause, *see Poor Richard's*, 322 N.C. at 64, 366 S.E.2d at 698–99, represent "the supreme expression of the people's will," *Cmty. Success Initiative v. Moore*, 384 N.C. 194, 211, 886 S.E.2d 16, 32 (2023). And by including this right in the Declaration of Rights, the people declared it was a "fundamental human right[ ] which their government was bound to respect." *Corum*, 330 N.C. at 787, 413 S.E.2d at 292; *see also id.* at 783, 413 S.E.2d 290 ("The very purpose of the Declaration of Rights is to ensure that the violation of [individual and personal] rights is never permitted by anyone who might be invested under the [c]onstitution with the powers of the State."). Accordingly, "[t]he mere interference with this fundamental right by the government is all that is required" to warrant review under the state constitution. *N.C. Bar & Tavern*, slip op. at 15 (citing *King v.*

*Town of Chapel Hill*, 367 N.C. 400, 408, 758 S.E.2d 364, 371 (2014)).[17] But like other rights, the fundamental right to earn a livelihood is not absolute, and government regulation of business is not always doomed to invalidation.

For a state action that burdens the fundamental right to earn a living "to survive constitutional scrutiny under [the Fruits of Their Own Labor Clause and Law of the Land Clause]," however, "the challenged state action 'must be reasonably necessary to promote the accomplishment of a public good, or to prevent the infliction of a public harm.'" *Kinsley*, 386 N.C. at 424, 904 S.E.2d at 726 (quoting *State v. Ballance*, 229 N.C. 764, 769–70, 51 S.E.2d 731, 735 (1949)); *see also Poor Richard's*, 322 N.C. at 64, 366 S.E.2d at 699. This is a "'twofold' inquiry: '(1) is there a proper governmental purpose for the [state action], and (2) are the means chosen to effect that purpose reasonable?'" *Kinsley*, 386 N.C. at 424, 904 S.E.2d at 726 (quoting *Poor Richard's*, 322 N.C. at 64, 366 S.E.2d at 699); *see also State Constitution* 47; *cf. N.C. Bar & Tavern*, slip op. at 17 ("[T]h[is] legal standard . . . is not rational basis."). This test is not a judicial sword for judges to wield against business regulations they personally deem "bad" or "unwise." *Poor Richard's*, 322 N.C. at 64, 904 S.E.2d at 698

---

[17] Similar to the dissent in *N.C. Bar & Tavern*, the dissent in this case accuses us of "greatly expand[ing] the type of activity protected by the Fruits of Their Own Labor Clause" simply because we reiterate that the mere interference with the right to earn a living triggers constitutional review. As we said in *N.C. Bar & Tavern*, however, "for nearly a century, this Court has recognized a Fruits of [Their Own] Labor Clause claim when the state unconstitutionally interferes with the right to conduct a lawful business." Slip op. at 18 (first citing *State v. Harris*, 216 N.C. 746, 753, 6 S.E.2d 854, 859 (1940); then citing *State v. Ballance*, 229 N.C. 764, 768, 51 S.E.2d 731, 733–34 (1949); and then citing *Roller v. Allen*, 245 N.C. 516, 521–23, 96 S.E.2d 851, 856–57 (1957)).

(quoting *State v. Warren*, 252 N.C. 690, 696, 114 S.E.2d 660, 666 (1960)). Rather, it is a dispassionate inquiry based on facts and evidence. *See id.* at 64–66, 114 S.E.2d at 698–700; *Kinsley*, 386 N.C. at 424–26, 726–27.

The complaint in this case seems to focus on the second prong: whether the executive orders' closures of bars were a reasonable means to effect the purpose of limiting COVID-19's spread. To determine if the governmental actions were reasonably necessary, the court conducts "a fact-intensive analysis" to answer two "fact-specific questions." *Kinsley*, 386 N.C. at 426, 904 S.E.2d at 727. First, the court determines "how effective [the state action is] at achieving the desired public purpose." *Id.* Second, the court determines the extent of the burden the state action places on the targeted businesses. *Id.* Taking these considerations together, the court must then decide whether, given all the options available, it was reasonable for the State to choose the selected approach. *Id.* (citing *Poor Richard's*, 322 N.C. at 66, 366 S.E.2d at 700). Ultimately, this is "a question of degree," and the court must judge the means employed by "balancing the public good likely to result . . . against the burdens resulting." *Id.* (quoting *Poor Richard's*, 322 N.C. at 66, 366 S.E.2d at 700) (instructing courts to consider the "corresponding benefits and burdens"). Notably, "the [State's] police power is severely curtailed" when the government endeavors to "exclude persons from engaging in [an ordinary business or occupation]." *State v. Harris*, 216 N.C. 746, 759, 6 S.E.2d 854, 863 (1940) (describing such expansive laws as "legal grotesquery").

With these rules of law in mind, we turn finally to the complaint. Plaintiffs allege that the Governor's initial actions directly mandated that they close their bars. Even though the Governor later permitted bars to reopen, plaintiffs allege that his simultaneous direction for bars "to not serve alcoholic beverages for onsite consumption" had the practical effect of requiring them to remain closed. Plaintiffs acknowledge that the Governor allowed bars to operate outdoor seating areas in limited fashion as late autumn approached, but they nonetheless allege that this choice only benefitted those few bars with outdoor seating areas and amenable weather. Plaintiffs further allege that any relief was short-lived anyway because the Governor subsequently issued executive orders prohibiting plaintiffs from selling alcoholic beverages between 9:00 p.m. and 7:00 a.m.—a decision that allegedly "ha[d] the practical effect of making bars unprofitable to operate." All told, from the first closure order to the filing of plaintiffs' complaint, plaintiffs allege that the Governor's executive orders forced them to keep their doors shuttered—either outright or in practice—for approximately nine months with no end then in sight. Plaintiffs allege that the totality of these events shows that defendants violated their fundamental right to earn a living.

The complaint unquestionably puts the trial court and defendants on notice of the transactions, occurrences, or series of transactions or occurrences that plaintiffs intend to prove. Indeed, defendants do not contend they are unable to understand the nature and basis of plaintiffs' claims or to file a responsive pleading. Should any

uncertainty remain, "the liberal opportunity for discovery and the other pretrial procedures established by the Rules [will] disclose more precisely the basis of both claim and defense and . . . define more narrowly the disputed facts and issues." *Pyco Supply Co. v. Am. Centennial Ins. Co.*, 321 N.C. 435, 443, 364 S.E.2d 380, 384 (1988).

And importantly, if proved, the facts alleged in the complaint *could* entitle plaintiffs to relief under the Fruits of Their Own Labor Clause and Law of the Land Clause. Indeed, taken as true, the factual allegations indicate that at least some of the executive orders, when viewed individually and/or cumulatively, burdened plaintiffs heavily. *See Harris*, 216 N.C. at 759, 6 S.E.2d at 863; *cf. Kinsley*, 386 N.C. at 427, 904 S.E.2d at 728 (characterizing "an abatement order shutting down a single business" as an action imposing "a tremendous burden").[18] Given these burdens, the restrictions' "tendency to [accomplish their proper governmental purpose]" must be "constitutionally sufficient to justify them." *Poor Richard's*, 322 N.C. at 66, 366 S.E.2d at 700. This is true even in emergencies. As we reiterate today in *N.C. Bar & Tavern*,

---

[18] The dissent argues that "the burden on plaintiffs here was lighter" and "less severe" than those imposed on the defendants in *Kinsley*. This assertion does not withstand scrutiny. In *Kinsley* the defendants alleged that, after they refused to comply with Executive Order 141, "the State . . . issue[d] an abatement order shutting down a single business," *id.* at 427, 904 S.E.2d at 728; here plaintiffs allege that the Governor's executive orders either overtly required them to close their bars or so severely restricted their operations that they were rendered unprofitable and required to close in practice. Whether due to an abatement order to enforce an underlying executive order or due to the executive orders themselves, the defendants in *Kinsley* and plaintiffs here all alleged that the government forced them to close their respective businesses. Moreover, similar to the executive orders' gradual lightening of restrictions placed on plaintiffs, the abatement order in *Kinsley* provided a path for the racetrack to reopen in compliance with executive orders. Complaint at Ex. D, *Kinsley*, 386 N.C. 418, 904 S.E.2d 720 (No. 280PA22). Thus, although there are certainly factual distinctions between the cases, the burdens imposed are quite similar.

"even in a declared emergency, the powers of those who act on behalf of the people have limits . . . . However well-intentioned government actors may be, they are constrained by the enduring commands of the [c]onstitution." Slip op. at 2.

We recognize that the Governor and his staff were operating in an emergency scenario and that each executive order represents a decision at a particular point in time. Accordingly, when evaluating these emergency executive orders under the framework laid out above and in *N.C. Bar & Tavern*, the analysis must take into consideration the information available at each point in time.[19] Measures that may have been effective at an earlier time may not have been effective when imposed later. To prevail, plaintiffs must show that the executive orders' restrictions on bars were not reasonably necessary.

These determinations will ultimately be matters of degree for the court to decide in light of the established facts. We do not deign to predict exactly what the evidence will be or what it will show, so we take no position on these ultimate questions. For now, we simply acknowledge that plaintiffs' alleged facts put

---

[19] Again, like the dissent in *N.C. Bar & Tavern*, the dissent here accuses of us of "Monday morning quarterback[ing]." Not so. As we said in *N.C. Bar & Tavern*, "the Governor's actions will be judged on the information available at the time, not on what we know in hindsight." Slip op. at 19. We reiterate that we take no position on whether the executive orders' restrictions on bars were reasonably necessary to curb COVID-19 spread. We merely hold that plaintiffs' complaint survives defendants' motion to dismiss. But it should be clarified that the Governor issuing his executive orders in response to a deadly, worldwide pandemic does not put his actions beyond the constitution's reach, compel the judiciary's reflexive deference, or preclude relief after the fact. Just as in *N.C Bar & Tavern*, "[w]hat frustrates the dissent [in this case] is not that [the] Governor . . . and his public health officials are being held to account through the lens of hindsight; it is that they are being held to account at all." Slip op. at 19–20.

defendants on notice and, under current law, could support a violation of the Fruits of Their Own Labor Clause and Law of the Land Clause. Because plaintiffs' claims are colorable, they have satisfied all the pleading requirements and sovereign immunity does not bar their *Corum* claims. The Court of Appeals majority ultimately arrived at this outcome, but it did not analyze plaintiffs' claims under the standards articulated above. We accordingly modify and affirm the decision of the Court of Appeals.

Before closing, we briefly address defendants' contention that regardless of the colorability of plaintiffs' claims, sovereign immunity should still bar their suit because plaintiffs did not seek the least intrusive remedy. In effect, defendants ask us to impose a fourth pleading requirement for *Corum* claims. We recently rejected this very argument in *Kinsley*, 386 N.C. at 429, 904 S.E.2d at 729, and we do so today in *N.C. Bar & Tavern*, slip op. at 11–14. We reject it again here. As *Kinsley* and *N.C. Bar & Tavern* explain, the question of the least intrusive remedy "arises [only] *after* the claimant proves a constitutional violation." *Kinsley*, 386 N.C. at 429, 904 S.E.2d at 729 (citing *Corum*, 330 N.C. at 784, 413 S.E.2d at 291); *cf. N.C. Bar & Tavern*, slip op. at 12 ("On the front end, we simply ask whether another established route to court exists to address purported violations of constitutional rights."). Indeed, because a trial court must ensure a plaintiff receives a "meaningful" remedy while also minimizing any encroachment on other branches of government, the least intrusive remedy is inherently fact dependent, varying from case to case. *See Kinsley*, 386 N.C.

at 429–30, 904 S.E.2d at 729–30 (quoting *Washington v. Cline*, 385 N.C. 824, 830, 898 S.E.2d 667, 672 (2024)). Accordingly, this inquiry is implicated only on the "back end" of the litigation. *N.C. Bar & Tavern*, slip op. at 13. Moreover, *Corum* places the responsibility of crafting the least intrusive remedy on the trial court, not the plaintiffs. 330 N.C. at 784, 413 S.E.2d at 290. For these reasons, this Court has never required a plaintiff to request the least intrusive remedy to maintain a *Corum* claim. *See Deminski*, 377 N.C. at 413–14, 858 S.E.2d at 793–94. Accordingly, we reiterate that the least intrusive remedy limitation is not incorporated into the test for pleading a valid *Corum* claim and cannot be the basis for a viable Rule 12 motion to dismiss. *Id.* at 429, 904 S.E.2d at 729.

We acknowledge that the COVID-19 pandemic was a chaotic period of time. It is important to remember, however, that the Governor was not the only person facing uncertainty. Small business owners across the state dutifully shuttered their doors and scaled back operations without knowing exactly when they could open or operate fully again. They, too, did not know what the future held and were without the benefit of hindsight. Many were compelled to lay off employees, deplete cash reserves, take out unwanted loans, or close for good. By virtue of the enshrinement of the fundamental right to the fruits of one's own labor, the basic promise of the state constitution is that government regulations of this right are open to scrutiny. It may be that the executive orders' restrictions on bars were reasonably necessary, but the state constitution gives plaintiffs the opportunity to put them to the test. Plaintiffs

have stated colorable constitutional claims under Article I, Sections 1 and 19. Because they have satisfied the requirements to successfully plead a *Corum* claim, sovereign immunity does not bar plaintiffs' suit. Accordingly, the decision of the Court of Appeals is modified and affirmed.

MODIFIED AND AFFIRMED.

Justice EARLS dissenting.

The Court today reshapes the Fruits of Their Own Labor Clause—and with it, the constitutional balance of power. The majority abuses notice pleading principles to invite meritless litigation. Once those cases arrive, the majority grants itself a roving license to second-guess policy choices, reweigh trade-offs, and displace decisions appropriately made by the political branches. Its new doctrine has no basis in this Court's unanimous opinion from one year ago, *Kinsley v. Ace Speedway Racing, Ltd.*, 386 N.C. 418 (2024), nor in our constitutional scheme.

If this logic holds, it risks unsettling the separation of powers and turning a constitutional safeguard into a judicial veto. With this decision, the Fruits of Their Own Labor Clause drifts ever closer to becoming a *Lochner*-esque weapon, as this Court installs the judicial branch as superintendent of laws and regulations that have economic effects. The state Constitution does not endorse such a judicial power grab nor should a court that styles itself as constitutionally conservative. I respectfully dissent.

## I.  The Majority's Expansion of the Fruits of Their Own Labor Clause

Plaintiffs are a group of bar owners and employees. During the COVID-19 pandemic, the Governor used his statutory authority to curb the virus and keep hospitals from buckling. Because COVID-19 passes easily from person to person,

especially indoors, the Governor restricted certain businesses and activities. Those limits applied to bars, including plaintiffs'. They sued, arguing that the Governor violated their right to earn a living under the Fruits of Their Own Labor Clause. They alleged that the temporary COVID-response restrictions closed their bars or practically made them "unprofitable." The bars did not allege that the Governor's actions were unreasonable, made with an improper purpose, or even ineffective at curbing the spread of COVID-19 or saving lives.

The question is whether, looking at plaintiffs' complaint and the executive orders attached to it, the temporary COVID-19 restrictions on plaintiffs' bars struck a reasonable balance between public good and private burden. Based on the allegations in the complaint and taking them as true, the answer to that question is yes.

## A. The Governor's Response to COVID-19

It is easy to critique pandemic-era decisions with the luxury of hindsight. Today, we have vaccines, treatments, and a clearer grasp of the COVID-19 virus. But in 2020, uncertainty ruled.

In the spring of that year, COVID-19 swept across the globe, upending life as we knew it. The virus has since claimed more than a million American lives, including nearly 30,000 in North Carolina. But in those early months, the scale of the threat was unclear. Public health experts warned that, without swift action, COVID-19 could infect four in five Americans, hospitals could collapse, and the crisis could spiral

out of control. The virus itself was deadly. A failing healthcare system could make it far worse.

Governments moved quickly. There were no vaccines and no proven treatments. But North Carolina had one advantage: forewarning. The virus struck Europe first, then tore through major U.S. cities like New York, where hospitals buckled under the strain. Officials in North Carolina did not have all the answers, but they knew that the virus spread fast, that large indoor gatherings fueled outbreaks, and that unchecked surges could overwhelm hospitals and increase the number of casualties.

On 10 March 2020, Governor Cooper declared a State of Emergency and invoked his authority under the North Carolina Emergency Management Act. Exec. Order No. 116, 34 N.C. Reg. 1744, 1744–49 (Mar. 10, 2020) (citing N.C.G.S. §§ 166A-19.10, -19.20 (2019)). As COVID-19 cases rose, the state imposed restrictions to curb person-to-person contact. Among them, Executive Order 118 temporarily closed bars and limited restaurants to take-out and delivery. *See* Exec. Order No. 118, 34 N.C. Reg. 1834, 1835–36 (Mar. 17, 2020). As conditions changed, so did the state's response. North Carolina adopted a phased reopening plan, lifting limits where it could while keeping high-risk settings—like bars—under tighter control.

The Governor's orders explained why. *See, e.g.*, Exec. Order No. 141, 34 N.C. Reg. 2360, 2364 (May 20, 2020). Some environments posed a greater risk of transmission: places where people gathered in close quarters, that had poor

ventilation, or where people did things that increased respiratory effort—shouting, singing, or physical exertion. *See id.* at 2361; Exec. Order No. 163, 35 N.C. Reg. 713, 715–16 (Sept. 4, 2020); Exec. Order No. 169, 35 N.C. Reg. 900, 902 (Sept. 30, 2020); Exec. Order No. 181, 35 N.C. Reg. 1524, 1526–27 (Dec. 8, 2020). Bars checked every box. *See* Exec. Order No. 169, 35 N.C. Reg. at 902. Unlike restaurants, where patrons remained seated, bars encouraged mingling, close contact, and loud conversation. *See id.* Alcohol lowered inhibitions, making people less likely to follow distancing and masking rules. *See id.* And unlike most businesses, bars made masks impractical— customers were drinking continuously while socializing. *See id.* at 904. The risks were real. Evidence from across the country and abroad linked bars to outbreaks. *See id.* And states that reopened bars too soon saw cases surge.

Still, as conditions improved, restrictions eased—first cautiously, then more broadly. On 5 May 2020, some businesses resumed operations under strict limits. *See* Exec. Order No. 138, 34 N.C Reg. 2141, 2141–42, 2148 (May 5, 2020). Restaurants and breweries, for instance, could provide services at reduced capacity. *See id.* Bars were allowed to reopen, too. *Id.* Given their higher risk, though, bars could sell alcohol for off-site consumption but could "not serve alcoholic beverages for onsite consumption." *Id.* at 2148.

By late September, bars could serve up to 100 customers outdoors. Exec. Order No. 169, 35 N.C. Reg. at 900, 902, 911. They could also sell mixed drinks to-go. *Id.* These limits remained in place through December, with indoor service still

prohibited. Exec. Order No. 181, 35 N.C. at 1536–37, 1546–47 (Dec. 8, 2020). Then, in early 2021, after "measured progress" in key COVID-19 metrics, bars reopened indoors—though with capacity caps. Exec. Order No. 195, 35 N.C. Reg. 2078, 2080 (Feb. 24, 2021). Finally, on 14 May 2021, the Governor lifted all remaining restrictions. *See* Exec. Order No. 215, 35 N.C. Reg. 2651, 2655 (May 14, 2021). Since then, no executive orders have limited bars from operating.

Plaintiffs challenge the restrictions in place from 17 March 2020 (Exec. Order No. 118) to 8 December 2020 (Exec. Order No. 181). They argue the Governor's orders violated their constitutional right to earn a living.

## B. The Majority Lowers the Bar for Claims Under the Fruits of Their Own Labor Clause

The majority allows this suit against the Governor to move forward, holding that plaintiffs have colorably alleged a violation of the Fruits of Their Own Labor Clause. That is so, the majority reasons, because plaintiffs claim that the challenged orders either forced their bars to close or made continued operation unprofitable. That, the majority says, "burdened plaintiffs heavily." But on effectiveness, plaintiffs are silent. They do not allege that the orders failed to curb COVID-19's spread or to keep hospitals from being overrun. No matter, says the majority—notice pleading principles excuse these plaintiffs from having to allege facts to show that the orders were unreasonable based on what the state knew then. Plaintiffs' claims can proceed, even though they offer no theory for why the executive orders lacked a sufficiently close relationship to the proper purpose of protecting public health by "limiting

COVID-19's spread."

That reasoning stretches the Fruits of Their Own Labor Clause in three ways—each making it easier to sue the state for laws and regulations that have economic effects, and harder for it to respond to future crises. To be clear, my concern is not with the principles that govern Rule 12(b)(6) motions. It is with the new substantive standard the majority crafts and applies to keep this claim afloat. In both reasoning and result, today's decision threatens to turn the Fruits of Their Own Labor Clause into a deregulatory cudgel.

First, the majority treats all the Governor's orders as equally burdensome, blurring the line between outright closures and lesser impairments to profitability. That broadens what counts as a "heav[y]" burden. In truth, though, the Governor's response evolved over time, relaxing temporary restrictions as conditions improved. Plaintiffs never claim that their businesses were shuttered indefinitely—and for good reason.

Bars were closed at the start of the pandemic, but then they gradually reopened with restrictions—first, alcohol sales for off-site consumption; then, outdoor service for up to 100 patrons. *See* Exec. Order No. 138, 34 N.C Reg. at 2148; Exec. Order No. 169, 35 N.C. Reg. at 911. Indoor service followed with capacity limits until all restrictions were lifted in May 2021. *See* Exec. Order No. 195, 35 N.C. Reg. at 2080; Exec. Order No. 215, 35 N.C. Reg. at 2655.

Plaintiffs tacitly acknowledge that their burden eased over time. Once the

complaint reaches the later orders, it shifts focus—not to government action, but to external factors. They note that some of their bars lacked outdoor seating; for others, bad weather interfered with their plans. These were not burdens imposed by the Governor's orders, but they were background conditions outside the state's control. Eliding that distinction and treating every order as equally restrictive disregards the Governor's evolving pandemic response and step-by-step loosening of COVID-19 measures.

That creates a perverse incentive. If every incremental adjustment carries the same constitutional risk, the safest course is inaction. Why act swiftly in an emergency if every modification along the way will be deemed an equally grave interference with business? By making it easier to challenge a range of executive action as "heavily" burdensome, the majority discourages leaders from taking decisive action in crises.

In the same vein, the majority appears to greatly expand the type of activity protected by the Fruits of Their Own Labor Clause. It emphasizes that "mere interference" with economic liberties violates fundamental rights, and it credits plaintiffs' allegations that the regulations at issue "practical[ly]" impaired their profitability. But traditionally, the Fruits of Their Own Labor Clause has limited only severely restrictive and arbitrary state action: for example, licensing regimes that wholly exclude qualified persons from ordinary occupations, *Roller v. Allen*, 245 N.C. 516, 525 (1957), or abatement orders that unfairly single out one business for closure

while leaving all others in place, *Kinsley*, 386 N.C. at 426. Where is the majority's limiting principle? What separates commonplace health and safety regulations from constitutionally invalid measures that deny persons "the enjoyment of the fruits of their own labor"? *See* N.C. Const. art. I, § 1.

Put another way, many state actions have the practical effect of impairing private sector profitability. Speed limits, for example, dampen how quickly a company can deliver food and thus practically impair its profitability. But regulations that limit profit-making do not, without more, give rise to a constitutional case. Applying that basic principle here, the majority is wrong to indiscriminately credit all of the alleged restrictions as equally burdensome—and a "heav[y]" burden at that.

Second, the majority excuses plaintiffs from pleading a key element of a claim under the Fruits of Their Own Labor Clause—that the government action was an ineffective way to advance a public benefit. Under Rule 12(b)(6) of the Rules of Civil Procedure, a complaint must "state enough to give the substantive elements" of a claim. *Stanback v. Stanback*, 297 N.C. 181, 204 (1979); *see also* N.C.G.S. § 1A-1, Rule 12(b)(6) (2023). At the pleading stage, of course, we take as true the "well-pleaded material allegations of the complaint." *Wray v. City of Greensboro*, 370 N.C. 41, 46 (2017) (cleaned up). But that does not mean we rubber-stamp "unwarranted deductions of fact." *Id.* (cleaned up). Even under our notice-pleading system, a complaint is fatally defective if its allegations, read in the plaintiff's favor, "reveal[ ] the nonexistence of an essential substantive element" of the claim. *Stanback*, 297

N.C. at 205.

That is the problem with plaintiffs' complaint here. A government action violates the Fruits of Their Own Labor Clause only if its burden outweighs its likely effectiveness in serving the public good. Efficacy is therefore central to that analysis—without it, there is no way to balance private hardship against public benefit. Although plaintiffs claim that the Governor's orders burdened their businesses, they say nothing about whether the restrictions were unlikely to or failed to curb COVID-19. The majority effectively concedes this. It obliquely admits in a footnote that plaintiffs' complaint here is "not structure[d] . . . around the standards articulated [in *Kinsley*.]" But instead of requiring plaintiffs to allege ineffectiveness or offer supporting facts, it just ignores this part of the legal standard completely. That is not how pleading works. A complaint must include enough facts to support a claim, not just sidestep inconvenient ones. If merely alleging lost profits now meets the pleading standard, then the majority has created an exceptionally low bar—one it reserves for this particular constitutional right.[1]

---

[1] It bears emphasizing that plaintiffs are not actually advancing the theory that the majority ascribes to them. Attempting to elaborate on what is missing from their complaint, plaintiffs at oral argument explained that they have a claim because the Governor was not treating like businesses alike when the state subjected "stand-alone bars" to restrictions that hotels and restaurants with bars were not. Oral Argument at 30:00–33:40, *Howell v. Cooper* (No. 252A23) (Oct. 23, 2024), https://www.youtube.com/watch?v=20TT0jW6BbA (last visited Aug. 19, 2025). That is the essence of an equal protection argument based on non-suspect characteristics and is properly rejected. *See N.C. Bar & Tavern Ass'n v. Stein*, No. 126PA24, slip op. at 20–22 (N.C. Aug. 22, 2025). Indeed, plaintiffs' equal protection claim here was dismissed below and not challenged on appeal. This distinction underscores that the majority is wrongly inviting meritless litigation over routine line-drawing by the political branches for certain favored constitutional claims.

The third problem is the majority's vague definition of "reasonably necessary" under the Fruits of Their Own Labor Clause. The majority frames the issue as "whether the executive orders' closures of bars were a reasonable means to effect the purpose of limiting COVID-19's spread." The relevant considerations, the majority tells us, are "how effective" these orders were at achieving that purpose and "the information available at each point in time." The majority thus implies that constitutional reasonableness hinges at least in part on empirical efficacy: what worked as a public health intervention to stop the spread of COVID-19? It also depends on what "information was available"—where the majority's use of the passive voice obscures what the relevant information would show and to whom it was available.

To the extent the majority's definition of what is "reasonably necessary" is empirical, that poses a problem right out of the gate: How do courts isolate the efficacy of one subset of regulations on a single sector—here, plaintiffs' bars—when those measures were just one thread in a broader public health response?

COVID-19 spread easily, in many places and through many forms of contact. That fact demanded a wide-ranging approach—one that extended beyond any single type of business. Bars were closed, then reopened in stages—but so were nail salons,

---

The majority also stresses that, even though *these* plaintiffs did not plead a colorable claim, "future litigants" will be required to do so. *See* majority *supra* n. 16. It is unfair and unjust for this Court to arbitrarily lower the pleading bar for some plaintiffs while denying others the same preferential treatment.

day camps, skating rinks, and bingo halls. The Governor followed what he called a "dimmer switch" strategy, loosening restrictions gradually, in phases, and offsetting new risks by holding the line elsewhere. So when some schools resumed in-person learning in October 2020, limits on higher-risk settings—like bars—remained. That was the tradeoff within a coordinated, statewide response, made amid uncertainty.

Nonetheless, the majority appears to believe that courts can pluck one subset of COVID-19 regulations from the whole, then ask whether they *alone* made a difference. But how can we know? How do we measure whether closing plaintiffs' bars changed infection rates when, at the same time, other restrictions were tightening or lifting? When new variants were spreading or new treatments were being developed? When people were gathering together for the holidays or staying indoors because of the cold? The data do not exist in a vacuum and cannot be cleanly pulled apart. The majority invites courts to play a game of what-if—asking what would have happened had plaintiffs' bars been given free rein to stay open during a pandemic. But counterfactuals like that are speculative by nature and, in this context, are all but unknowable.

Hanging constitutional reasonableness on what worked as a public health intervention, with all the benefits of hindsight, is neither fair nor realistic. In 2020, the virus was novel, fast-moving, and little-understood. Officials did not have the benefit of peer-reviewed studies or model-perfect forecasts. They had to act quickly, using the best information they had to address a virus that, left unchecked, could

overwhelm hospitals and cost thousands of lives. They made judgment calls under pressure, often in real time. To pick apart those choices now—armed with later data and a backward-looking lens—is to demand something close to clairvoyance. It is to expect perfect foresight from leaders who were navigating in a fog. It comes close to demanding prophetic knowledge from officials forced to act under pressure.

State action in the throes of an emergency cannot solely be judged by whether it worked in the end. We see this in contexts besides COVID-19. Suppose the state, battling a wildfire, orders rangers to light a counterfire. Or picture a hurricane, bearing down on the coast. The state shutters and evacuates a town squarely in its projected path. If the counterfire fails or the storm veers elsewhere, were the state's choices unreasonable? Most would say no. We judge the state's decisions by the conditions in which they were made, not just by the outcomes that came later. A response can still be reasonable if it reflects the urgency of the moment and the best information available to decisionmakers. That the danger unfolded differently—or not at all—does not strip the decision of its rationality when it was made.

The same holds true here. No one suggests that the Constitution vanishes during a crisis. As explained below, real limits control how and why the state uses its emergency powers. A business, for example, may challenge a pandemic measure if it plausibly alleges that the state singled it out for its views while giving a pass to others just like it—an action that undercuts the measure's stated aim. But courts reviewing such claims after the dust has settled must remember what the government knew

*then*, not what we know *now*. Reasonableness in a crisis cannot mean perfection proved later—it must reflect the uncertainty, urgency, and limited knowledge that marked the moment. Judging an emergency measure solely by its later-proven effectiveness is to weigh yesterday's choices on golden scales, with all the clarity of hindsight and none of the pressures of the moment. The majority's vague standard thus thinly veils its ultimate objective: superintending the state's response to the pandemic from its comfortable perch as a Monday morning quarterback.

Ultimately, though, one is left to guess at what the majority means by "reasonably necessary" in this context because its opinion does not actually identify what set of facts plaintiffs here could adduce in discovery to show that the restrictions on them did not "tend[ ] to [accomplish their proper governmental purpose]," quoting *Poor Richard's*, *Inc. v. Stone*, 322 N.C. 61, 64 (1988) (second alteration in original). Thus even as the majority invokes notice pleading principles to greenlight plaintiffs' complaint, it declines to give defendants notice of the legal standard they will be held to on remand.[2]

---

[2] The majority emphasizes that it "take[s] no position on whether the executive orders' restrictions on bars were reasonably necessary to curb COVID-19 spread." Yet it simultaneously submits that this action is really about "h[olding]" "[the] Governor . . . and his public health officials . . . to account" for their "response to a deadly, worldwide pandemic." This type of "double-speak, also known as gaslighting," is unfortunately becoming too familiar in this Court's executive power jurisprudence. *See* Special Order, *Stein v. Berger*, No. 114P25, slip op. 2 (Earls, J., dissenting) (N.C. May 23, 2025).

In any event, as the dissent in *Bar & Tavern* makes clear, this Court has not hesitated to allow valid claims under the Fruits of Their Own Labor Clause to move forward when a plaintiff has adequately alleged that the action is necessary to hold state actors accountable for alleged violations of constitutional rights. *N.C. Bar & Tavern Ass'n v. Stein*, No. 126PA24,

There is another problem—not one of method, but of values. The majority's conception of "unreasonable" is not neutral, rather it puts profit above public health. The Court frames the injury as: plaintiffs' bars were either closed or limited during the first stretch of the COVID-19 pandemic. That, we are told, was a "heav[y]" burden—and one the state must later justify with proof of public health gains. So now, under the majority's logic, temporarily closing or restricting bars during a once-in-a-century pandemic is unconstitutional if the policy turns out not to have worked "enough"—whether not enough lives were saved, or not enough people were protected from this virus, it does not say. Embedded in this logic is a slanted cost-benefit analysis—one that skews toward economic deregulation and places profit margins above public health risks. This business-above-all hierarchy of values is misplaced to say the least. It also underscores why this Court has no business using plaintiffs' flimsy allegations to constitutionalize its policy preferences.

## C. The Majority Distorts *Kinsley*

Precedent does not dictate today's decision. The Court's decision in *Kinsley v. Ace Speedway Racing, Ltd.*, 386 N.C. 418 (2024), did not turn the Fruits of Their Own Labor Clause into a *Lochner*-style sword against economic regulation, nor does it compel the majority's conclusion here. The two cases diverge on key fronts—the severity of the burden, the effectiveness of the state's actions, and the proper lens for

---

slip op. at 46–47 (N.C. Aug. 22, 2025) (Riggs, J., dissenting) (citing *Kinsley v. Ace Speedway Racing, Ltd.,* 386 N.C. 418 (2024)).

evaluating them.

Start with *Kinsley* as a reference point. There, Ace Speedway—a racetrack—repeatedly defied COVID-19 emergency orders limiting mass gatherings. *See id.* at 420–21. The track's owner did not just ignore the gathering limits—he flouted them, publicly criticizing the Governor and refusing to comply. *See id.* The state responded with an abatement order, declaring the racetrack an "imminent hazard" and shutting it down immediately. *Id.* at 421. The order also required Ace Speedway to cancel events, notify the public, and confirm compliance in writing. *Id.* When the racetrack still refused, the state sued to enjoin future events pending its compliance. *Id.* at 422.

Ace Speedway challenged the shutdown under the Fruits of Their Own Labor Clause. Its complaint alleged that the state's actions were retaliation for the owner's political speech rather than a legitimate public health measure. *See id.* at 426. We held that Ace Speedway plausibly alleged both elements of a claim under the Fruits of Their Own Labor Clause: (1) that the state lacked a proper governmental purpose and (2) that the means it chose were unreasonable under the circumstances. *See id.* at 426–27.

As for purpose, the state argued that it acted to "protect[ ] North Carolinians from a novel virus." *Id.* at 426. But, as we explained, the complaint's "central allegation" was that "the purpose of the abatement order was not to protect public health, but to retaliate against Ace Speedway for criticizing the Governor." *Id.* And Ace Speedway backed that up with specific allegations. *See id.* It claimed that health

officials took no similar action against other large outdoor venues whose owners kept quiet. *Id.* If true, that disparity suggested that Ace Speedway was "singled out by the Governor for enforcement" not "to protect the public interest, but to punish a private business for standing up to the government." *Id.* That, we said, was not a proper governmental purpose. *Id.* at 426–27.

That brought us to the second prong—whether the means chosen were reasonable. At that stage, we weighed the burden of the state's action against its likely effectiveness in advancing its stated goal. *See id.* at 427.

The burden on Ace Speedway, we emphasized, was "tremendous." *Id.* Accepting the allegations as true, the complaint described a "series of 'unusual steps' to single out and shut down Ace Speedway." *Id.* at 420. First, state officials directed the local sheriff to pressure the racetrack into postponing its upcoming event. *See id.* at 421. When that failed, the state pushed the sheriff to arrest the racetrack's owner. *Id.* at 420. When the sheriff refused, the state ordered public health officials to shut down the racetrack as an "imminent hazard." *Id.* at 421. The order was no half measure—it forcibly closed Ace Speedway and branded it an immediate threat to public health. *See id.* at 422. The track had to broadcast its closure, notify the public that upcoming races were canceled, and provide written confirmation to the state that it had done so. *Id.* at 421. Before reopening, it had to implement COVID-19 controls and submit a compliance plan for state approval. And when Ace Speedway resisted the shutdown order, the state sued and obtained an injunction barring it from hosting

any events until it complied. *Id.* at 422. According to the complaint, the state's escalating measures "required the Speedway to cease operating," imposing immense economic and operational burdens.

Yet, for all that, the state's actions were patently ineffective at advancing its stated goal. By the state's own account, "large mass gatherings at places like racetracks presented an elevated risk for spreading COVID-19." *Id.* at 427. The abatement order, it argued, was "reasonably necessary" based on "the best scientific and medical knowledge available at the time." *Id.* But as the complaint detailed, other racetracks and similar businesses allowed more than twenty-five people at their events in clear violation of the emergency order—yet they faced no enforcement. *Id.* at 422.

Even assuming the state's public-health rationale, it selectively enforced its policy against a single business while ignoring others presenting the same risk. *Id.* at 427. And so even without hindsight, the state's approach was "particularly ineffective" at achieving its stated goal. *Id.* On its face, shutting down one racetrack while allowing others to operate could not plausibly reduce community transmission. *See id.* A severe burden paired with a policy that was ineffective by its own logic made for a plausible constitutional claim. *Id.* Balancing the costs and benefits, we explained, the state's decision to single out Ace Speedway while ignoring other violators was an unreasonable infringement on the right to earn a living. *Id.*

This case stands on far different footing than *Kinsley*. For one, no one disputes

that the actual purpose of the executive orders was to protect public health by limiting COVID-19's spread. That fairly qualifies as a proper governmental purpose. So already, this case parts ways with *Kinsley*—here, unlike there, the state acted in pursuit of a valid public goal.

The differences persist at the second step of a claim under the Fruits of Their Own Labor Clause. Compared to *Kinsley*, the burden on plaintiffs here was lighter. The Governor's orders did not impose an absolute or indefinite shutdown. Nor did they apply monolithically. Unlike an abatement order shutting down a business completely, the Governor's pandemic restrictions evolved over time, gradually allowing bars more flexibility to operate as conditions improved. A law's burden is measured not just by what it prohibits, but also by what it permits. By that measure, the restrictions here were less severe than those in *Kinsley*.

The same goes for effectiveness. *Kinsley* turned on an obvious contradiction: the state claimed a public health rationale but enforced its policy in a way that was "particularly ineffective." *See Kinsley*, 386 N.C. at 427. The complaint alleged, with specific facts, that the state's selective enforcement made no sense under its own logic. And crucially, the Court in *Kinsley* evaluated that failure based on what officials knew at the time—not just in hindsight.

Here, plaintiffs make no such claim of inefficacy. They do not allege that the Governor's orders failed to curb COVID-19. They offer no facts suggesting that the restrictions did not seem like a reasonable response. Instead, they focus solely on

economic harm—on lost profits—without disputing that the restrictions served a public health purpose. And unlike in *Kinsley*, the majority now invites after-the-fact scrutiny of the Governor's pandemic response.

In these ways, today's decision breaks from *Kinsley* rather than applying it. By stretching the Fruits of Their Own Labor Clause to fit this case, the majority lowers the bar for challenging state action and blesses judicial intermeddling with regulations on businesses. That is not what the Clause demands. And it is certainly not what *Kinsley* held.

## II. The Majority's Arrogation of Judicial Power

In broader view, today's decision is a judicial power grab contrary to separation of powers principles and affords unequal treatment to fundamental constitutional rights. The majority reshuffles authority between the branches of government and elevates economic interests above other fundamental protections.

## A. Shifting Power to the Judiciary

Governors, like all officials, are not above the law—they must act within constitutional and statutory boundaries. At the same time, courts reviewing executive decisions must respect the separation of powers, North Carolina's foundational commitment to dispersing authority between the three branches of government. *See* N.C. Const. art. I, § 6. The legislature makes laws, the judiciary interprets them, and the "executive branch, which the Governor leads, faithfully executes, or gives effect to" them. *State ex rel. McCrory v. Berger*, 368 N.C. 633, 635

(2016). As each of "the three branches of government carry out their duties, one branch will not prevent another branch from performing its core functions." *Id.* at 636. When the legislature entrusts the Governor with authority, he fulfills his constitutional duty by executing that authority within its prescribed limits. *See id.* at 646–47. Those decisions deserve the due respect of a coordinate branch, and courts should not lightly override discretionary policy choices properly assigned to the executive. *In re Alamance Cnty. Ct. Facilities*, 329 N.C. 84, 100–01 (1991) (enjoining that one branch "must minimize the encroachment" on another branch "in appearance and in fact").

The majority, though, ventures down a different path. Its decision risks destabilizing the balance of powers and injecting the judiciary into the state's emergency response—and even into appropriate and routine policymaking by the political branches. The Emergency Management Act vested Governor Cooper with authority to act swiftly during crises like COVID-19. *See* N.C.G.S. §§ 166A-19.10, -19.20 (2019). His orders, issued under that statute, "affirmatively implement[ed] the policy decisions" entrusted to him "through delegation from the General Assembly." *Cooper v. Berger*, 370 N.C. 392, 415 (2018). In reviewing those decisions, judges should not glibly displace the Governor's duly assigned discretionary authority with their own balancing of policy tradeoffs. Judicial oversight is not a veto power, and this Court should not weaponize constitutional provisions to wrest "control over the execution of the laws from the Governor and lodge it with itself." *See McCrory*, 368

N.C. at 647; *Hart v. State*, 368 N.C. 122, 126 (2015) ("Just as the legislative and executive branches of government are expected to operate within their constitutionally defined spheres, so must the courts.").

The majority apparently has little qualms about stripping future state actors of their ability to respond to crises. As explained above, this decision weighs the scales toward state inaction. In times of emergency, state officials will have cause to hesitate—chilled by the fear that even temporary restrictions, even those gradually eased, may later fall to a court's hindsight-laden judgment of costs and benefits.

The chill does not end there, as the majority's reasoning invites judicial second-guessing after mere allegations of lost profits. That is an open invitation for lawsuits—one that might as well arrive on engraved stationery. And it signals a judiciary willing to install itself as the superintendent of policymaking. If democratic accountability is the touchstone for judicial deference, the COVID-19 restrictions rest on two layers of it: first, the legislature that delegated the authority; and second, the voters who chose the executive official to wield it. Yet when business profits are at stake, the majority appears to forget its recent pronouncements that the power of judicial review must be used with "great reluctance," lest the judiciary meddle with "expressions of the people's will." *McKinney v. Goins*, 387 N.C. 35, 43 (2025) (first quoting *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6–7 (1787); and then quoting *Cmty. Success Initiative v. Moore*, 384 N.C. 194, 211 (2023)).

Note that claims need not be successful to have a chilling effect. The majority

signals that state actors can expect to be hauled through extensive litigation no matter how carefully they act. If the majority's rationale holds, a plaintiff need only allege a "heav[y]" burden to their economic rights to get on the expressway to discovery for this "fact-intensive analysis" predicated on "fact-specific questions." *See Kinsley*, 386 N.C. at 426. In that case, I fail to see how the state will successfully dismiss any Fruits of Their Own Labor Clause claim on a Rule 12(b)(6) motion—no matter how trifling the "interference" or compelling the state action. This is strongly in tension with basic separation of powers principles. It hardly fosters due respect among our coordinate branches for one to allow the other two to be dragged into discovery and even trial to defend their choices, as a matter of course and no matter the circumstances. *See In re Alamance Cnty. Ct. Facilities*, 329 N.C. at 100–01.

The majority hands litigants a roadmap for challenging policy measures that affect businesses. Now, when the state acts, challengers can demand that courts scrutinize whether it weighed all possible policy options and struck the "right" balance. That shifts our role from judicial review to judicial micromanagement. If carried forward, such reasoning risks turning courts into de facto overseers of policy decision-making. It is difficult to imagine a purer example of legislating from the bench.

## B. Lopsided Solicitude for Constitutional Rights

Finally, this decision lays bare the majority's asymmetric treatment of constitutional rights. For claims under the Fruits of Their Own Labor Clause, the

majority demands something more than rational basis. This species of economic rights, we are told by the majority, is triggered at the point of "mere interference" with the "right to conduct a lawful business or to earn a livelihood." *Accord N.C. Bar & Tavern Ass'n v. Stein*, No. 126PA24, slip op. at 15 (N.C. Aug. 22, 2025) (quoting *Treants Enters., Inc. v. Onslow County*, 83 N.C. App. 345, 354 (1986), *aff'd*, 320 N.C. 776 (1987)). Judges must employ "fact-intensive analys[e]s" to ferret out the government's actual purpose and decide whether the state, "given all the options available," struck the right balance between burdens and benefits. This degree of judicial second-guessing would make a central planning committee blush.[3]

Yet when other, more fundamental rights come before this Court, the majority loses its appetite for such careful review. Equal protection claims against racial discrimination, for instance, receive no such exacting scrutiny. *See, e.g.*, *Holmes v. Moore*, 384 N.C. 426 (2023) (upholding voter ID law and narrowing the path for plaintiffs challenging racial discrimination under the state Constitution's Equal Protection Clause). Nor do claims of wealth-based discrimination in voting laws. *See, e.g.*, *Cmty. Success Initiative*, 384 N.C. 194 (applying rational basis review to a claim that conditioning felon re-enfranchisement on wealth violates the state Constitution). And extreme partisan gerrymandering is deemed a "judgment call" for the legislature, beyond the reach of judicial review. *Harper v. Hall*, 384 N.C. 292, 317

---

[3] The majority insists its interpretation of the Fruits of Their Own Labor Clause follows from "nearly a century" of precedent. The dissent in *N.C. Bar & Tavern Ass'n* explains why that is not so. *N.C. Bar & Tavern Ass'n*, slip op. at 43–44 (Riggs, J., dissenting).

(2023); *see id.* at 300 (declaring partisan gerrymandering a nonjusticiable political question).

Under today's ruling, the right to earn a living enjoys more constitutional protection than the right to participate equally in our democracy. A bar's ability to profitably serve alcohol during a pandemic is treated as more sacrosanct than core guarantees of democratic governance. That flips constitutional priorities on their head. It is as troubling as it is unsound. This is not the system our Constitution envisions nor one to which I subscribe.

### III.    Conclusion

The global COVID-19 pandemic took an enormous toll. Not only were businesses and workers sidelined for a time, their livelihoods disrupted or destabilized, but nearly 30,000 North Carolinians were killed and hundreds of thousands were made sick. This toll was not borne equally. Just as some families were more affected than others when they lost multiple loved ones to the deadly virus or navigated living in an immunocompromised household, some businesses struggled more than others under pandemic conditions where different conduct carried different risk. But under our jurisprudence, a Fruits of Their Own Labor claim does not result when state emergency response measures, aimed at keeping people safe, have the effect of impairing business profits. The issue here is whether plaintiffs' complaint sufficiently alleged that the state's response to this public health crisis failed to strike a reasonable balance between public good and private burden. The

complaint did not do so. Accordingly, plaintiffs' claim is properly dismissed.

Justice RIGGS joins in this dissenting opinion.